JAMES B. KITCHEN V. DELIA CARTER, ADMINIS-
TRATRIX.

FILED APRIL 7, 1896.   No. 5935.

1. **Negligence:** CONSTRUCTION OF DANGEROUS BUILDINGS. The
owner of real property in exercising his own tastes and
inclinations as to the character of a building he will erect
thereon, has no right to build and maintain a structure
which, by reason of defects or inherent weakness either
in material or construction, is liable to fall and do injury
to an adjoining owner or the public.

2. ———: ———: DAMAGES. If a building falls because of
defects in material and workmanship reasonably within
the knowledge of the owner thereof, and thereby inflicts
injury upon adjoining owners or their property or any
person lawfully in its vicinity, the owner is liable for the
damages ensuing therefrom.

3. ———: CAUSE OF INJURY. A party is only answerable for
the natural, probable, reasonable, and proximate conse-
quences of his acts; and where some new efficient cause
intervenes, not set in motion by him, and not connected
with, but independent of, his acts, not flowing there-
from, and not reasonably in the nature of things to be
contemplated or foreseen by him, and produces the in-
jury, it is the proximate and dominant cause.

4. ———: ———. The question of the proximate cause of an
injury is one for the jury, but when their decision thereof
is clearly and manifestly wrong it will be set aside.

ERROR from the district court of Douglas county. Tried below before DOANE, J.

*George E. Pritchett* and *J. C. Cowin,* for plaintiff in error.

References: *Lewis v. Flint & P. M. R. Co.,* 19 N. W. Rep. [Mich.], 744; *Jucker v. Chicago & N. W. R. Co.,* 52 Wis., 150; *Pennsylvania Co. v. Hensil,* 70 Ind., 569; *Larson v. St. Paul & D. R. Co.,* 45 N. W. Rep. [Minn.], 1096; *Whitman v. Wisconsin & M. R. Co.,* 17 N. W. Rep. [Wis.], 124; *Pease v. Chicago & N. W. R. Co.,* 20 N. W. Rep. [Wis.], 908; *Fowler v. Chicago & N. W. R. Co.,* 21 N. W. Rep. [Wis.], 40; *Bernso v. Gaston Gas Coal Co.,* 27 W. Va., 285; *Childrey v. City of Huntington,* 12 S. E. Rep. [W. Va.], 536; *Marvin v. Chicago, M. & St. P. R. Co.,* 47 N. W. Rep. [Wis.], 1123; *St. Louis, A. & T. R. Co. v. Neel,* 19 S. W. Rep. [Ark.], 963; *St. Louis I. M. & S. R. Co. v. Commercial Ins. Co.,* 139 U. S., 223; *Ewing v. Pittsburgh C. C. & St. L. R. Co.,* 23 Atl. Rep. [Pa.], 340; *Herr v. City of Lebanon,* 24 Atl. Rep. [Pa.], 207; *Shaaber v. City of Reading,* 24 Atl. Rep. [Pa.], 692; *Deming v. Merchants Cotton-Press & Storage Co.,* 17 S. W. Rep. [Tenn.], 89; *Lynch v. Northern P. R. Co.,* 54 N. W. Rep. [Wis.], 611; *Nelson v. Chicago, M. & St. P. R. Co.,* 14 N. W. Rep. [Minn.], 360; *Anderson v. Chicago, B. & Q. R. Co.,* 35 Neb., 101; *McGowan v. St. Louis Ore & Steel Co.,* 19 S. W. Rep. [Mo.], 200; *Keightlinger v. Egan,* 65 Ill., 236; *Beehler v. Daniels,* 29 Atl. Rep. [R. I.], 6; *Purcell v. English,* 86 Ind., 34; *McAlpin v. Powell,* 70 N. Y., 126; *Pittsburgh, F. W. & C. R. Co. v. Bingham,* 29 O. St., 364; *Sweeny v. Old Colony & N. R. Co.,* 10 Allen [Mass.], 372; *Larmore v. Crown Point Iron Co.,* 101 N. Y., 391; *Severy v. Nickerson,* 120 Mass., 306; *Omaha &*

*R. V. R. Co. v. Martin,* 14 Neb., 298; *Gibson v. Leonard,* 37 Ill. App., 344; *Woodruff v. Bowen,* 34 N. E. Rep. [Ind.], 1113.

*Connell & Ives, contra.*

References: *Hayes v. Michigan C. R. Co.,* 111 U. S., 228; *Mutual Ins. Co. v. Tweed,* 7 Wall. [U. S.], 44; *Baltimore & P. R. Co. v. Reaney,* 42 Md., 117; *Grimes v. Louisville, N. A. & C. R. Co.,* 30 N. E. Rep., [Ind.], 200; *Davis v. Garrett,* 6 Bing. [Eng.], 716; *Campbell v. City of Stillwater,* 32 Minn., 308; *Boss v. Northern P. R. Co.,* 49 N. W. Rep. [N. Dak.], 655; *Couts v. Neer,* 9 S. W. Rep. [Tex.], 40; *Village of Carterville v. Cook,* 22 N. E. Rep. [Ill.], 14; *Denver, T. & G. R. Co. v. Robbins,* 30 Pac. Rep. [Colo.], 263; *Houghkirk v. Delaware & Hudson Canal Co.,* 92 N. Y., 219; *Lockwood v. New York, L. E. & W. R. Co.,* 98 N. Y., 526; Cooley, Torts [2d ed.], p. 367, and cases cited; *Gilbert v. Nagle,* 118 Mass., 278; *Welch v. McAllister,* 15 Mo. App., 492; *Indermaur v. Dames,* 1 C. P. [Eng.], 274; *Carleton v. Franconia Iron & Steel Co.,* 99 Mass., 216; *Nickerson v. Tirrell,* 127 Mass., 236; *Low v. Grand Trunk R. Co.,* 72 Me., 313; *Smith v. Lambeth Assessment Committee,* 10 L. R., Q. B. [Eng.], 327; *Toomey v. Sanborn,* 146 Mass., 28; *Bennett v. Louisville & N. R. Co.,* 102 U. S., 577; *Learoyd v. Godfrey,* 138 Mass 315; *Gorham v. Gross,* 125 Mass., 232; *Hannem v. Pence,* 40 Minn., 127; *Shipley v. Fifty Associates,* 106 Mass., 194; *Khron v. Brock,* 11 N. E. Rep. [Mass.], 748; *Simmons v. Everson,* 26 N. E. Rep. [N. Y.], 911; *Wilkinson v. Detroit Steel & Spring Works,* 41 N. W. Rep. [Mich.], 490; *Bensen v. Suarez,* 28 How. Pr. [N. Y.], 512; *City of Anderson v. East,* 19 N. E. Rep. [Ind.], 726; *Hydraulic Works Co. v. Orr,* 83 Pa. St., 332; *Schilling v. Abernethy,* 112 Pa. St., 437; *Gramlich*

v. *Wurst*, 86 Pa. St., 80; *Gillespie v. McGowan*, 100 Pa. St., 149; *Lynds v. Clark*, 14 Mo. App., 74; *Glidden v. Moore*, 14 Neb., 84.

HARRISON, J.

The plaintiff in error, during the year 1886 and prior and subsequent thereto, was a part owner and had control of the premises known as the "Paxton Hotel property" in the city of Omaha. In 1886 the southwest portion of the building was what was called an "annex" to the main body of the building and this annex was fifty feet long, twenty-two feet wide, and two stories high. During the year stated the plaintiff caused an additional or third story to be built upon the annex. For this third story there were no plans and specifications made and no architect was employed to superintend its construction. A pencil sketch of the desired improvement was made and given by plaintiff in error to an experienced contractor and builder with directions to furnish the material and perform the labor, or have the necessary labor performed, the payment to be the reasonable value of the labor and material, or such sum as could be agreed upon between the parties. During the early part of the night of April 12, 1891, fire was discovered in the southwestern lower room of the annex, then being used as a kitchen. A fire-alarm was turned in and was promptly responded to by some of the organizations or companies belonging to the fire department, the members of which, as soon as they reached the premises, took active measures for stopping the fire. Some of them discovering, as they believed, evidences of fire in the upper northwest corner or room in the third

story of the annex, a ladder was raised from a vacant portion of an adjoining lot and placed so that the upper end reached or rested against the window sill of the room; and some of the firemen,—among them Michael J. Carter,—started up the ladder with a line of hose. They had proceeded but a short distance when a portion of the brick wall, against and by which the ladder was supported, fell outward and struck and injured the firemen who were upon the ladder. From the effect of injuries so received, Michael J. Carter soon afterward died, and this suit was instituted by Delia Carter, his wife and the administratrix of his estate, to recover damages under the provisions of our statute for the pecuniary loss resulting from his death. The right to recover in the action was predicated upon the alleged negligence of plaintiff in error in procuring or allowing the use of poor, inferior material in the building of the third story of the annex and its faulty and defective construction in certain particulars specifically designated in the petition. These statements all and singular of the petition in relation to negligence imputed to plaintiff in error and defects of any nature in the construction of the additional story to the annex, were denied in the answer. The result of a trial in the district court was a verdict and judgment in favor of defendant in error in the sum of $5,000, and to secure a review of the proceedings in that court the case has been removed to this court by petition in error.

Counsel for plaintiff in error, in a reply brief, state, or assume it to be proven, that the deceased fireman was in or on the premises or building of plaintiff in error and was there a mere licensee,

and hence the plaintiff in error owed him no duty, and even conceding that negligence had been shown, yet no liability accrued. That a licensee, in entering upon property, assumes the risks of injury resulting to him from any defective, imperfect, or dangerous conditions of the premises, but this we need not discuss or decide as we do not think the question is raised by either the pleadings in the case or the facts. It was alleged in the petition that the fireman, when injured, was on a vacant lot adjoining the Paxton Hotel property, and the evidence discloses that he, with other firemen, went on the vacant lot first referred to, and reared a ladder against the hotel building, or more properly speaking, the annex, and was in the act of ascending it to go upon or into the building, when the brick wall fell on them and they were not in or on the premises of plaintiff in error. It was alleged in the petition that a part of the wall of the building,— the third story of the annex,—for no sufficient cause except its own defects and inherent weakness, fell westward and outward and injured the firemen. The theory of this portion of the cause of action was based upon the proposition that in erecting the building, the third story, if it was so defectively constructed, to the knowledge of the proprietor, as to be dangerous, and because of weakness it fell and injured anyone lawfully in its vicinity, or, as in this case, on the adjoining lot, the owner of the building was liable for any damage so suffered. Carter, the fireman, was lawfully on the adjoining lot. He had a right to go and be there for the purpose of fighting fire in this or any other of the buildings in that portion of the city. With regard to insecure build-

ings and liability attaching to the owners thereof it is said in Wood, Nuisances, p. 140, sec. 109, "While a man has a right to follow his own tastes and inclinations as to the style and character of the building that he will erect upon his own land, yet he has no right to erect and maintain there a building that is dangerous, by reason of the materials used in, or the manner of its construction, or that is inherently weak or in a ruinous condition and liable to fall and do injury to an adjoining owner or the public. Such a building on a public street is a public nuisance, and is a private nuisance to those owning property adjoining it; and if the building falls and inflicts injury upon the adjoining owners or their property, or to any one who is lawfully in its vicinity, the owner is liable for all the consequences that ensue therefrom." (See authorities cited in support of the text.) "The owner of a building is not an insurer against accident from its condition, but so far as the exercise of ordinary care will enable him to do so he is bound to keep it in such condition that it will not, by any insecurity or insufficiency for the purpose to which it is put, injure any person rightfully in, around, or passing it." (*Ryder v. Kinsey*, 64 N. W. Rep. [Minn.], 94.)

But it is urged by counsel for plaintiff in error that the evidence is insufficient to support a finding of defective construction of the third story of this building, and the falling as a consequence thereof; and further, that if it be conceded that the structure was not of the safest character, or was not safe, the proximate cause of the falling of the wall was the effect of the fire; that this was an intervening cause, and the immediate and principal one, and not within the reasonable contem-

plation of the proprietor of the premises when building or having built the third story to the annex, including the wall in question, or set in motion by him or arising from the construction of the wall or the manner of its erection; that he was not bound to foresee and so guard against any but natural and probable consequences,—things likely to follow his acts; or, in other words, the fire and the resultant falling of the wall, not being in any manner or degree connected with or referable to him or the construction of the wall, he was relieved from any liability for injuries caused thereby. It appears from the evidence that the portion of the wall which fell was of a side wall of a third story, which had been built during the year 1886, on the top of one of the walls of a two-story brick building theretofore built and existing; that the first story had what some witnesses called "a sixteen-inch wall," and some a seventeen-inch. The second story had what was denominated "a twelve-inch wall," and the third story, or new one, was an eight, or, as one witness called it, "a nine-inch wall." The new wall was a twelve-inch one up to the top of the floor joists put in for the new or third story, then to its top— eleven feet—was an eight-inch wall. There were ceiling joists, two by eight and twenty-two feet long, put on sixteen inches apart, some of them anchored in a twelve-inch wall of the Paxton building, and all attached to or resting on it, and, at the other end, attached to or resting on the new wall, and fastened to some of them were iron anchors which extended through the new wall, and were bolted or appropriately fastened at the outer end—at the outer side of the wall. The roof timbers were 2x10 or 2x12 and at

one end were two feet or more above the ceiling timbers, and at the other rested on them or on a level with their upper edges, and both roof and ceiling timbers were connected or tied by a system of braces, on trusses. There were some partitions in the new or third story, one of which served, in part, to separate from the general space and form a room called, in the record, the "fire room," being the one from which the portion of the wall fell. This room, in size, was twenty-two by twenty-four feet six inches. This new wall reached to and overlapped a piece of new eight-inch wall on another building, known as the "Goodrich Building," some witnesses state, and some say made an abutting joint with it. It appears that they were not in line, and at this place, a number of witnesses say, the two walls were connected by spikes and pieces of iron. There is also evidence tending to show that they were not so joined. Mr. Whitlock, city building inspector, testified, and in so doing stated that "the west wall of the old building had sagged in toward the east. In running up the additional wall and making the third story, they kept carrying it over until they got a straight wall from the window. The result was it left an overhang of nearly half the thickness of the wall, which showed at the time the extent that was between the two windows. There was a bow in the wall." All the other witnesses who testified on this point stated that the old wall had bulged out and the new wall was drawn in instead of built out, or so as to overhang. All agreed in the statement that the brick used in building the wall were good, and this may be said to be established by the great weight of the evidence as to the mortar. Some of

the witnesses gave it as their opinion that the eight-inch wall was not a proper one to build; that it was not such a one as in their judgment should have been built there. The city inspector of buildings said in his judgment it was not a safe wall, but the preponderance of the evidence was to the effect that it was a properly built and safe eight-inch wall and proper in the position, under the circumstances, and for the use for which it was intended. In regard to the fire and the part it played, if any, in causing the wall to fall, the chief of the fire department and some of the firemen who were present at this fire testified to the effect that the most of the burning in this third-story room occurred after the falling of the wall, but the chief was asked the following question: "Q. Now, then, it had got up into the ceiling, between the ceiling and the roof, before the wall fell?" To which he answered: "A. Why, she must have."

The city building inspector was interrogated upon cross-examination and answered as follows:

Q. At the coroner's inquest were you asked this question, and did you make this answer. I am not now asking you with respect to the facts in the answer or the matters inquired of, but simply ask you whether you so testified at the coroner's inquest: "Q. So far as you can observe, there was nothing to indicate that the wall was hot, or that it fell out by reason of the heat?" To which you answered: "No, I think the ceiling joist, and that is what threw the wall over."

A. That is what I thought at the time.

Q. And that is the way you testified?

A. I presume that is the way I did, if it is down that way.

54

Q. And that was your theory,—that the fire burned off the ceiling joist? "The fire followed the steam pipes and came up in between the roof and the ceiling and of course shows there, now, to have burned the ceiling joist off, and as soon as they burned off it threw the wall out."

A. That is what I said about that.

Q. Was this question asked you by Mr. Connell: "If that ceiling joist that burned and the wall fell in, can you account for the falling of the wall on any other theory except that the wall was of insufficient thickness and was not properly joined and connected together—can you account for it in any other way?" "A. I will say this, that the morning after the fire, that the ceiling joists, they were broken off, but whether they were burned off before the wall fell, I should judge, from the ceiling joists that were burned and remained there, that they must have burned before the wall fell." Did you so testify?

A. I think so, about that way; it is a good while ago.

During re-direct examination:

Q. In reference to the burning of the ceiling joist, did you, at the coroner's inquest, or do you now claim to have any personal knowledge as to when the burning of those joists occurred?

A. Well, it must have occurred before the fire, because the joists could not have burned in the position they were in. The part down in the ground, they must have burned before the wall fell.

Q. Have you any personal knowledge except merely that is your conclusion?

A. That is what I found the morning after the fire.

Q. Were you at the fire?

A. No, sir; I was not at the fire.

Q. You have not any personal knowledge as to how the burning actually took place?

A. I was not there to see it, of course.

It was shown that just where the wall fell a number of the ceiling joists had been entirely severed by the fire, and pieces of them were among the brick and mortar which fell to the ground. One piece was there with an anchor attached, and ends of these ceiling joists were also in the "fire room," on the floor, with anchors attached. The roof timbers were none of them entirely burned off, but were blackened or rather charred. We are not unmindful here of the argument of counsel for defendant in error, in part founded upon the supposition that the anchor attached to the piece of lumber which was found in the debris was one which had fallen with a piece of floor joist, and the further argument on this part of the case, in which they refer to the different theories advanced by the witnesses in reference to what caused the wall to fall. We must include, in any view we attempt to take of this subject, a few facts which were not controverted. The wall was placed there during the year 1886 and stood almost, if not quite, five years, and was, to all appearances, safe and fit for the uses to which it was put and to withstand the effects of use, time, and any ordinary tests to which it might be subjected, and, as stated by counsel for defendant in error in their brief: "There was the fact that the wall fell at the time of the fire, which was not disputed;" and in this connection we may add that there was the evidence, not contradicted, of the destruction by the fire of some of the means

which had been adjusted, some primarily and
some secondarily, with the purpose to assist in
retaining the brick wall in an upright position and
make it safe. A careful review and analysis of
the testimony leads us to the conclusion that it
establishes that the fire and its accompanying
facts and circumstances caused the falling of the
wall. Whether or not, or to what extent, any in-
herent weakness or defect in the wall was a factor
in bringing about such a result, is not very readily
perceivable or answerable. However this may
have been, Mr. Kitchen, in constructing or having
constructed this third story of the wall thereof,
had exercised such care that it had been and was
safe, sufficient, and secure for any and all pur-
poses or uses for which it was intended, and would
not, from any inherent defects, fall and injure any
person or persons passing it, or near it. It stood,
in the condition in which it was made, for several
years, and if the fire had not occurred, would no
doubt have stood for years more. The fire did not
have its origin in any act of the plaintiff in error,
nor did it flow from or have its source in that
wherein it is claimed he had been negligent, the
erection of the wall. The fire was the immediate
and dominant cause of the falling of the wall, and
hence was the proximate cause of the injury.

But it is urged that what was the proximate
cause was a question of fact for the jury, and their
determination of it should not and will not be dis-
turbed. Ordinarily, what is the proximate cause
of an injury is, in any case where the question is
involved, one of fact for the jury to determine;
but where, as in this case, their decision of the
question is manifestly wrong, it will be set aside.
This is a case in which the sympathies are strongly

appealed to and enlisted, but justice and right must prevail and govern the course of the decision. On the facts and circumstances as they appear in the record, the judgment of the trial court must be reversed and the cause remanded.

REVERSED AND REMANDED.