CASHIN, Respondent, *v.* NORTHERN PACIFIC RAILWAY
CO., Appellant.

(No. 7,168.)

(Submitted November 28, 1933.   Decided January 18, 1934.)

[28 Pac. (2d) 862.]

*Messrs. Walker & Walker* and *Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

96

*Mr. A. G. Shone* and *Mr. H. Lowndes Maury,* for Respondent, submitted a brief; *Mr. Shone* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal by the defendant, the Northern Pacific Railway Company, from a judgment in favor of Mary E. Cashin, plaintiff.

Between Butte and Homestake, the main line of the Northern Pacific Railway is constructed along a steep mountainside strewn or set with large granite boulders which, with the winter frost and spring thaws, are apt to become loosened and a menace to traffic on the line. Each spring loosened boulders are broken up by blasting and removed from the mountainside. Prior to 1929, this plaintiff lived with her husband and children at a point but 400 feet from the railroad track and at the foot of the mountain; Robert Cashin, the husband, then purchased a tract of land a short distance away, and the family removed thereto. The dwelling-house on this tract stands, with its rear toward the railroad, 984 feet distant and on an elevation 336 feet below that of the track. Once while the Cashins lived at the old location, and at least twice after they moved to their present home—all prior to 1932—blasting by the defendant on the mountainside caused the breaking of windows in their house, and in each instance a claim for the damage done was paid by the defendant company.

On May 31, 1932, a crew under the direction of defendant's roadmaster, without warning to the occupants of the Cashin premises, blasted a boulder lying on the mountainside some 25 feet from the track on the upper side and at an elevation of 12 feet above it, opposite the Cashin home, estimated to weigh 20 tons. The blasting was done by ''Bulldozing,'' the method theretofore employed by the company, and which consists of laying dynamite on top of the boulder, covering it, and exploding the charge. On this occasion the crew used a full 50-pound box of 40 per cent. dynamite, the third largest amount ever used for any purpose at one time by the section foreman, who had been there employed for forty years; he does not say that either of the larger charges was used for blasting boulders.

Robert Cashin testified that, on settlement for a prior damage, he told N. W. Simmonds, the district claim agent for defendant, at Butte, that Mrs. Cashin was nervous and became scared by unexpected blasting, and that Simmonds told

him that they would in the future be notified before any blasting was done; that after a blasting in 1930 he went to Simmonds and told him he was not "a man of his word." Simmonds denied that he had either of the conversations related.

At the time of the blasting on May 31, 1932, Mrs. Cashin was hanging up clothes at a point from 10 to 20 feet to the rear of her kitchen door. She testified that she heard the detonation and saw rocks falling about the yard; she raised her arms and felt pain between her shoulders and knew no more until some time later, when she regained consciousness in a chair in the house. Edward Grinrod, brother of Mrs. Cashin, testified that he was away from the house at the time, but returned a few minutes after the blast, when he found Mrs. Cashin "knocked completely unconscious"; he carried her into the house. He testified further, that the glass in the kitchen door was broken and an irregular piece of granite was lying on the kitchen floor amidst broken glass; a bedroom window was also broken and glass scattered over the bed and floor.

Cashin testified that he found the rock in the kitchen and that "there was butter all over the floor and glass and rocks mixed with the butter." He testified that he reported the matter to Simmonds and told him that Mrs. Cashin was "knocked out." Simmonds offered to pay for the broken glass as the company had done theretofore.

Dr. J. L. McCarthy, of Butte, described Mrs. Cashin's condition as he found it shortly after the blasting and continuing thereafter as that of shattered nerves from shock comparable to that of shell-shocked veterans.

Mrs. Cashin testified that, while she had been nervous before and had been "troubled" by former blasts so that, at night, she was made nervous by the passage of the watchman's car on the track as indicating that another blast might be set off in the night, her present condition was due to the shock of this last blasting.

This action was instituted to recover actual and punitive damages for "severe and violent shock, both of body and

mind," causing permanent impairment of plaintiff's health. Plaintiff's allegation of negligence is that "the defendant * * * did negligently and wantonly and wilfully and intentionally, after notice given it of the danger of so doing and after promises not to do so * * * set off and explode a large and violent amount of dynamite * * * within * * * 700 feet or thereabout, of the residence of the plaintiff, and failed entirely to give warning to plaintiff and negligently failed to drill a hole for the blast and negligently failed to tamp material in on top of the same, and negligently laid said dynamite on top of the rock for blasting. * * * "

The defendant interposed a general demurrer to the complaint, which was overruled, whereupon it answered generally admitting the blasting of the boulder "at a point about opposite the residence of said plaintiff," and that it did not drill holes or notify the plaintiff that blasting was to be done, and denied the remaining allegations.

As an affirmative defense, the defendant alleged its operation of the road on its right of way since 1889 and its right to do so; described the condition existing at the designated point and that "in order to protect the traveling public riding upon its trains and to maintain said track in a safe condition for the operation of trains thereon, it is necessary from time to time to remove some of these large granite boulders." It is then alleged that, in removing the instant boulder, "in order to avoid the throwing of rocks for great distances and possibly upon the premises of plaintiff, the defendant did not drill holes * * * but placed dynamite on the surface of said boulder and covered the same with a heavy layer of dirt so as to crack and break said boulder without causing rock to be thrown any distance; that * * * no rock was thrown or cast upon the premises of plaintiff; that said blasting was done in a careful and prudent manner, according to the custom usually followed by men experienced in handling of dynamite"; that, if the plaintiff was of a nervous temperament, likely to be frightened or disturbed by the noise, the defend-

ant, its agents and servants, had no knowledge of the fact. Any new matter set up in the answer was met by a reply.

Trial was had in due course, resulting in a verdict for plaintiff for $1,250 actual, and $750 punitive, damages. Entry of judgment for $2,000 damages followed, from which judgment this appeal is taken.

The sufficiency of the complaint is challenged on the ground that there can be no recovery for a condition resulting merely from fright or shock, unaccompanied by contemporaneous physical injury. Counsel for the defendant concede that the authorities are in conflict on the subject, but assert that the great weight of authority supports their position; we do not find this to be the fact when the authorities are analyzed and the proper distinctions are drawn.

The cases cited by the defendant, and many more dealing with the subject, are correlated in 17 C. J. 831, section 152 (cited by counsel), and as notes to the next succeeding five or six sections on the subject. The statement of the text-writer in section 152 is that "the general rule supported by the weight of authority is that mental pain and suffering will not alone constitute a sufficient basis for the recovery of substantial damages" (certain exceptions noted), and many of the cited cases deal merely with attempts to recover for "mental pain and suffering," while others fail to distinguish between this class of cases and those wherein recovery is sought for actual injury to the nervous system and to the body by reason of fright and shock. After considering exceptions to the general rule stated, the author, in section 152 above, says: "Mental pain and suffering as such must be distinguished from pain and suffering ensuing from an injury to the nervous system, which is to be regarded as a physical injury, and as such sufficient in itself to support a recovery of damages." In dealing with the subject of "Fright or Shock" (section 158), the author declares that "in many jurisdictions there can be no recovery for physical results consequent upon such mere fright. A more logical view is that, in the case of physical consequences of fright, the fright occasioned by defendant's

wrongful act is an intervening but not a controlling cause, and that a recovery may be had for the physical consequences as the natural and proximate consequences of the original wrongful act," citing many cases from many jurisdictions.

The supreme court of California has said: "It must be conceded that a nervous shock or paroxysm, or a disturbance of the nervous system, is distinct from mental anguish, and falls within the physiological, rather than the psychological, branch of the human organism. It is a matter of general knowledge that an attack of sudden fright, or an exposure to imminent peril, has produced in individuals a complete change in their nervous system. * * * Such a result must be regarded as an injury to the body rather than to the mind, even though the mind be at the same time injuriously affected." (*Sloane* v. *Southern California R. Co.,* 111 Cal. 668, 44 Pac. 320, 322, 32 L. R. A. 193.)

Often the physical injury caused by the wrecking of the nervous system is more serious and lasting than the breaking of bones or the tearing of flesh, and, where it is clearly shown that such injury was suffered and was proximately caused by the negligent act of the defendant, a cause of action exists for damages for the resulting injury, and stands on a more firm foundation of reason than does that class of cases wherein it is held that the plaintiff must have been physically battered, "although slightly" (see *Southern Ry.* v. *Owen,* 156 Ky. 827, 162 S. W. 110), in order to recover for fright or mental distress.

The complaint is sufficient.

The defendant argues that, as it was expressly authorized ▆ by law to construct, maintain and operate its railroad, and since "nothing which is done or maintained under the express authority of a statute can be deemed a nuisance" (sec. 8645, Rev. Codes 1921), and because the removal of the boulder blasted was necessary for the protection of the traveling public, and because its employees testified that they adopted an approved method of blasting and exercised due care, the case is, in some manner, taken out of the operation

of the rules of law governing in the ordinary case, and the damage becomes consequential and forms no basis for a recovery. This theory was advanced and exploded in *Wine* v. *Northern Pacific Ry. Co.*, 48 Mont. 200, 136 Pac. 387, 388, Ann. Cas. 1915D, 1102, 49 L. R. A. (n. s.) 711, wherein this court said: "It is true that it is incumbent upon a common carrier, such as the defendant, to exercise the highest degree of care to keep its track and roadbed safe, and to this end make prompt and energetic use of every means at its command in every emergency to provide for the safety of the passengers, * * * and that this duty is higher than that which it owes to land owners along the line of its road; * * * but [this] does not justify the postulate that it may under any * * * circumstances" infringe on the rights of others, without rendering itself liable for the injury thus done "to the same extent as a natural person."

As the defendant company is authorized by law to construct, maintain and operate its line, nothing connected with such activities constitutes a nuisance *per se* (sec. 5, Art. XV, Mont. Const.; sec. 8645, Rev. Codes 1921) ; nor is the defendant an insurer against injury resulting from the proper maintenance and operation of its business. (*Hopkins* v. *Butte & Mont. Com. Co.*, 13 Mont. 223, 33 Pac. 817, 40 Am. St. Rep. 438; *Bray* v. *Cove Irr. Dist.*, 86 Mont. 562, 284 Pac. 539; *Heckaman* v. *Northern Pacific Ry. Co.*, 93 Mont. 363, 20 Pac. (2d) 258.) Hence it follows that, when the method employed "was the only mode of removing the rock practically available, that it was conducted with due care, and that it was necessary to enable the defendant" to conduct its business and safeguard its line and the public, and yet in some way injury results to an outsider, without negligence on the part of the defendant, the injury is unavoidable and there can be no recovery. (*Booth* v. *Rome, W. & O. T. R. Co.*, 140 N. Y. 267, 35 N. E. 592, 594, 37 Am. St. Rep 552, 24 L. R. A. 105, damage by concussion from blast without throwing rocks.) However, the right to throw stones by blasting so as to endanger the lives of adjacent land owners engaged in their domestic duties in and

around their dwellings, does not pass with a railroad right of way as a necessary incident to the easement (*Blackwell* v. *Lynchburg Ry. Co.*, 111 N. C. 151, 16 S. E. 12, 32 Am. St. Rep. 786, 17 L. R. A. 729); on the contrary, such a corporation owes to the public the same duty as does an individual to so use its property and exercise its right as not to infringe upon those of others, and, if it fails to exercise that degree of care which the circumstances and the law dictate and injury to another results proximately therefrom, liability follows (*Heckaman* v. *Northern Pac. Ry. Co.*, above, and cases cited).

Regardless, therefore, of the nature of the defendant's business, the question presented is as to whether or not the evidence justifies the jury's implied finding that the agents and employees of the defendant company were so negligent in conducting their blasting operations as to render it liable for the injury suffered by plaintiff.

It is generally held that, owing to the nature of the act, ▮ in conformity with the maxim *res ipsa loquitur*, proof of the throwing of rock by blasting is in itself prima facie evidence of negligence in not properly covering the blast, or in using explosives of unnecessary power, or in the loading of the blast (1 Thompson on Negligence, 2d ed., 711), and, unless satisfactorily explained and the prima facie case rebutted, it is sufficient to warrant a recovery (*Klepsch* v. *Donald*, 4 Wash. 436, 30 Pac. 991, 992, 31 Am. St. Rep. 936; Id., 8 Wash. 162, 35 Pac. 621; *Thurmond* v. *Ash Grove Lime Assn.*, 125 Mo. App. 57, 102 S. W. 619; *Britz* v. *Houlehan*, 77 Wash. 506, 137 Pac. 1035; *Beall* v. *City of Seattle*, 28 Wash. 593, 69 Pac. 12, 92 Am. St. Rep. 892, 61 L. R. A. 583).

The plaintiff, however, did not rely upon the presumption ▮ of negligence arising from the throwing of the rock, but produced two witnesses, experienced in the method of blasting employed and in blasting by drilling, who testified that the proper method under the circumstances would have been by drilling the boulder and placing the powder within it. One of these witnesses stated: "There is no better way of throwing and scattering rock than to put the loose powder on top of

the rock, unless you put it right under it"; that the bull-dozing method is all right when you are out in the open country with no one living in the vicinity, but that for the safety of persons within 2,000 feet the boulder should be drilled and the charge regulated according to conditions; that when necessary, by this method one can break up a boulder without throwing any part of it into the air. He was corroborated by the other witness.

It is true that many experts for the defendant testified that the "bulldozing method" was the approved method of blasting boulders in the open; "a reasonably careful and safe way of blasting rock"; the safest way it could be done for the public and for the benefit of the company as well"; and that "the method of drilling holes throws rock farther"; that the method employed is the method approved by the United States and specified in its road contracts.

Throughout the testimony of witnesses for the defendant is carried the suggestion that, when this "bulldozing" method is employed, the force of the explosion, in so far as the boulder is affected, is all downward, and pieces thereof cannot be thrown into the air. Following this line of thought, Hans Gunderson, roadmaster for the defendant for forty-seven years and in charge of the instant blasting, testified, "In the blasting of this rock it didn't throw any rock because it crushed the rock down and split it off." Tom Kary, an experienced workman on the job, testified that "when you put powder on top of a rock you do not blow the rock away, it goes right down." From the testimony of defendant's own experts, it appears that it is possible to break up a rock of any size without throwing fragments and without danger to persons or property in the immediate neighborhood.

W. A. Seyffert, a powder expert in the employ of the Dupont Powder Company, was asked a hypothetical question involving the facts as developed on the trial, and ending with: "What have you to say as to whether or not that method of blasting that rock was a reasonably careful, prudent method of doing the work, taking into consideration the location of this

building down here?" The witness could have answered merely that it was; it is significant that he answered, "By mudcapping * * * that would be the safe method." On cross-examination he said, "I said it was a recognized method of shooting boulders to plaster them, and bulldoze." "Mud-capping" or "plastering" was not resorted to; the powder was, instead, covered with fine dirt, according to witnesses for the defendant, and, in the hypothetical question, this was said to be "two feet of fine dirt."

Now, while the roadmaster in charge of the blasting told the jury that under the method employed, rocks could not fly and that no rocks flew on this occasion, the evidence of those present at the time and testifying for the defendant shows that they expected rocks to fly, and further that rocks did fly. Before the blast, all workmen retired to what they considered a safe distance, and most of them sought shelter. W. F. Williams, who had considerable experience in this method of blasting and who testified that he did not think there was any danger to the Cashin house, went 150 feet east, where he found, and crawled into, a hole under a large boulder, and found that only "two or three rocks" showered down around him. Henry Holland, who went 150 feet west and "stepped behind a boulder," said, "I was behind the boulder looking toward the Cashin house for safety; * * * I could see what rock was thrown at the Cashin house while I was behind the boulder around the curve; I could see quite a bit."

If, as the experts say, rocks will not fly when the bulldozing method is properly employed, when the powder is mud-capped or plastered, a reasonable deduction from the evidence is that there was negligence in the manner in which the method was employed, and "fine dirt" does not have the efficacy of "mud-capping" or "plastering."

There is justification in the record for the assumption that the defendant's workmen were not always careful to see that the entire covering consisted of "fine dirt," for, on a previous occasion, a witness had been near the Cashin house at the time

of a blast and narrowly escaped being struck by a piece of "quartz," while the workmen were blasting a granite boulder.

One John Bastian, who lives a mile from the Cashin house, testified that in April, 1931, a blast was set off on the mountainside along the railroad fully 2,000 feet from his home, and a rock the size of his fist and 12 to 14 inches long just missed him and buried itself 2 or 3 inches in the ground.

The distance from the point of the blast under consideration to the Cashin house was given as 996 feet in a straight line, or 1,024 feet following the contour of the mountainside, and what is said in *Klepsch* v. *Donald*, above, wherein the facts are similar to those in the present case, is applicable here. On the first appeal in that case, the court rejected the rule for which the plaintiff contended here that, in blasting cases, negligence is presumed and the defendant is not allowed to show due care in the manner of conducting the operations, but held that, in view of the dangerous nature of the agency used and "where every trace of the material used and the methods employed are usually blown out of sight, and beyond all possibility of proof, except by witnesses who will be naturally unwilling if not hostile," the proof should make a prima facie case. On the second appeal (8 Wash. 162, 35 Pac. 621, 622) the court said: "The very fact shown * * * that, in general, the rocks from defendants' blasts did not fly half as far as these particular rocks, certainly tended to show that there must have been an unusually heavy charge behind these rocks, or that some less than usually efficient means was taken to prevent their flight to such a prodigious distance [940 feet]. It lay with the defendants to explain how this unreasonable circumstance happened, and that it was not their fault."

The defendant failed to convince the jury of the absence of the negligence charged, and the foregoing excerpts from the evidence demonstrate that there is substantial evidence to warrant the implied finding that plaintiff's injury was caused by the negligent manner in which the blasting was conducted.

The defendant contends that the court erred in permitting Cashin to testify, over objection, that on previous occa-

sions he had notified Simmonds, the district claim agent for the defendant, that his wife was nervous and became frightened at blasting, and demanded that in the future notice should be given before a blast was set off, and that Simmonds promised that warning would be given.

The argument on this point is prefaced with the statement that the plaintiff would doubtless urge that, even though the blasting was done by a proper method and in a proper manner, liability resulted from not giving warning after such notice received, and it is asserted that Simmonds was not such an agent as, in law, that notice to the agent constituted notice to the principal.

Under the facts as developed and the law as heretofore declared, proof of notice of former injuries and the danger of blasting as theretofore was not necessary in order to fix liability, if the defendant negligently conducted its operations and that negligence was the proximate cause of the injury alleged. (See *Blackwell* v. *Lynchburg Ry. Co.,* above.) It follows that whether or not the company received the notice discussed was immaterial to the case, in so far as recovery of actual damages is concerned. However, knowledge on the part of the company may have some bearing on the judgment for exemplary damages, and we will therefore consider Simmonds' position with the defendant.

Simmonds testified that his authority was, with reference to claims for damages, "to investigate and to determine prima facie liability"; that as to former claims by Cashin he had investigated and reported to St. Paul, and the company had settled.

The rule as to knowledge of an agent which binds the principal is admirably stated in section 272 of "Restatement of the Law of Agency," as follows: "The liability of a principal because of the knowledge of the agent is based upon the existence of a duty on the part of the agent to act in the light of the knowledge which he has. The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform. The

knowledge may be of importance where: * * * 2. The conduct of an agent or principal interferes with the protected interests of another and thereby constitutes a tort against such other. * * * In determining tort liability, the knowledge which the actor has or should have is usually of great importance. This is particularly true in cases of negligence. * * * The agent must have a duty to reveal the information which he has. It is not enough that the agent has a duty in relation to the subject matter." (Sec. 275, p. 613.) "The knowledge must be important in view of the agent's duties and prior knowledge." (Page 614.) "It is declared that, as a principal may be held liable because of the knowledge of an agent, so he may be relieved from liability by reason of beneficial knowledge. As illustrative, it is said that 'A overhears T to whom he is about to deliver goods for P, state after receiving them he does not intend to pay. A thereupon refuses to make the delivery. Irrespective of T's intent to pay for the goods, P is relieved from liability for failure to deliver.' " Here the mere deliveryman was not authorized to investigate the likelihood of P receiving payment for his goods, but the knowledge he received was "important in view of the agent's duties and prior knowledge," and though his authority was only to make delivery, it was his duty to reveal the information he received while performing that duty, in order to protect the interests of his principal.

So here, while the authority of Simmonds extended only to obtaining facts of the present claim, on each occasion when he interviewed Cashin, knowledge thus received while investigating a claim that repetition of the negligent act might in the future be fraught with grave danger to a human being was a matter of importance to the principal, and, in the faithful performance of his duties as claim agent, it was Simmonds' duty to impart his information to his principal. The court did not err in admitting the testimony.

Contending that the evidence does not warrant an award of exemplary damages, the defendant asserts that the

court erred in giving its instruction No. 4, and that the verdict in this regard is contrary to the law as announced in instruction No. 12.

Instruction 4 embodies the subject matter of section 8666, Revised Codes 1921, and declares that "in any action for a breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

Instruction 12 contains the declarations that "before the defendant can be held liable * * * for exemplary damages, the plaintiff must prove that the defendant has been guilty of oppression or malice, actual or presumed; * * * in order to show [such guilt] * * * it is necessary for the plaintiff to prove that the defendant's servants engaged in doing this blasting were conscious of their conduct and conscious of existing conditions from which injury or illness would likely or probably result to plaintiff by their blasting of the rock in the manner they did, and that they wilfully and intentionally did some wrongful act or wilfully and intentionally omitted some known duty which resulted in the injury." The court, of course, instructed the jury that they must find actual damages before exemplary damages could be awarded.

The defendant contends that "to warrant the recovery of such damages, the act * * * must not only be unlawful but must partake somewhat of a criminal or wanton nature" (8 R. C. L. 535), "a guilty intent on the part of the defendant is essential" (17 C. J. 893), and "mere negligence or even gross negligence is not sufficient," citing cases. These are correct statements of the law, but the meaning of the terms employed must be ascertained in the application of the law to particular facts.

"Wanton" means "reckless, heedless or malicious." (Webster's Internat. Dictionary.) The intent which is "essential" is defined within our definition of "malice" which im-

ports "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (Sec. 10713, subd. 4, Rev. Codes 1921.) When used as the basis for an award of punitive damages, the word "malice" "implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations" (*Philadelphia Ry. Co.* v. *Quigley*, 21 How. (62 U. S.) 202, 16 L. Ed. 73); a wrongful act done intentionally without just cause or excuse (*Syfert* v. *Solomon*, 95 Cal. App. 228, 272 Pac. 810; *Wendelken* v. *Stone*, 88 N. J. L. 267, 86 Atl. 376).

In order to support an award of exemplary damages, the complaint must allege that "the tort was committed maliciously, wilfully or wantonly" (*Thompson* v. *Shanley*, 93 Mont. 235, 17 Pac. (2d) 1085, 1088), and, of course, the proof must sustain the allegation (*Olsen* v. *Montana Ore Pur. Co.*, 35 Mont. 400, 89 Pac. 731).

From the foregoing analysis of the law governing such an award it will be seen that, in this jurisdiction something more than gross negligence must be shown in order to justify such an award; that is, the act must be wanton, as the term is herein defined, or wilful, or warrant the designation of that act as malicious.

However, "the term 'malice,' as applied to torts, does not necessarily mean that which must proceed from a spiteful, malignant, or revengeful disposition, but a conduct injurious to another, though proceeding from an ill-regulated mind, not sufficiently cautious before it occasions an injury to another. * * * If the conduct of the defendant was unjustifiable and actually caused the injury complained of by plaintiff, which was a question for the jury, malice in law would be implied from such conduct." (*Moelleur* v. *Moelleur*, 55 Mont. 30, 173 Pac. 419, 421; *Jones* v. *Shannon*, 55 Mont. 225, 175 Pac. 882; *Ramsbacher* v. *Hohman*, 80 Mont. 480, 261 Pac. 273.)

The additional proof necessary to brand the act as going beyond mere gross negligence and justifying the award of

exemplary damages, may consist of evidence showing the continuance of a course of conduct known by the defendant to be unlawful and to cause injury, as blasting with knowledge that rocks would be thrown, without giving timely warning to those within the radius of danger (*Blackwell* v. *Lynchburg Ry Co.*, above); proof of repeated trespasses culminating in that for which the instant action was brought (*Yazoo Ry. Co.* v. *Sanders,* 87 Miss. 607, 40 So. 163, 3 L. R. A. (n. s.) 1119); or the continued maintenance of a nuisance after suit thereon has resulted in an award of damages for its initial maintenance (*Besso* v. *Southworth,* 71 Tex. 765, 10 S. W. 523, 10 Am. St. Rep. 814). Such showing fulfills the requirement of proof of the wilful or wanton disregard of the rights of others and justifies the award of exemplary damages. (8 R. C. L. 588.)

The evidence before the jury and in the record justifies the implied findings that for three years prior to the blasting of which complaint is here made the same agents and servants of the defendant who conducted the blasting operations in 1932 had, each spring, at a point on the mountainside opposite to, and within a similar distance from, the plaintiff's home, knowing that home to be occupied by human beings on each of the four occasions, conducted blasting operations which threw rocks to, upon and into plaintiff's home. That the fact that the rocks were so thrown was well known to the defendant is apparent, for complaints thereof were investigated by its agents for that purpose employed and their findings reported to the defendant, it, on former occasions having paid for the damage done. Further, that on May 31, 1932, these agents and employees, with knowledge of the effects of the former blasts, without altering their method of blasting, except for the use of a larger charge of dynamite than theretofore used, and without timely or other warning to the occupants of the house, blasted the rock in utter disregard of the injury which might be inflicted upon the plaintiff, who was then in the yard at her home, and which fact was known to at least one of the men engaged in the blasting.

The evidence further justifies the inference that the agents of the defendant knowingly employed the method which would cause injury to the house, and might cause injury or death to its occupants, in order to speedily and economically dispose of the threatening boulder, believing that it was to the advantage of the defendant to do so and pay for the damage done, as theretofore, rather than to adopt a more arduous method of removing the boulder.

This evidence warranted the imposition of exemplary damages on the theory that the act was knowingly done, in reckless disregard of the duty of the defendant and the rights of others. (*Scott* v. *Louisville R. Co.*, 217 Ala. 255, 115 So. 171.)

Error is predicated upon the giving of instruction 7, which advised the jury that "every person who, in this state shall recklessly use or handle any blasting powder, * * * whereby any human being is intimidated, terrified or endangered, is guilty of a misdemeanor and shall be punished by imprisonment in the penitentiary not exceeding five years or by a fine not exceeding $5,000, or by both fine and imprisonment. Corporations are liable in civil actions such as this for any and all damages to persons caused by any of their servants while acting in the course of their employment, if they commit crimes that injure, in person, third persons."

Up to and including the word "misdemeanor," the instruction embodies the provisions of section 2812, Revised Codes 1921, while section 2813 prescribes the penalty for a violation of any provision of the Act in which section 2812 appears.

On the settlement of instructions, the objection to the above instruction was that the statute was intended merely to cover criminal cases wherein a person sought intentionally to intimidate or terrify another for criminal purposes, and has no application to a case of persons acting in good faith in the performance of a lawful duty "who accidentally in the performance of such duty, scare or frighten a person." Whatever may have been the original intention of the legislature back in 1895, in enacting what is now section 2812, above, the

language of that section is clear and unambiguous and does not permit resort to the canons of construction. (*Osterholm* v. *Boston & Montana etc. Min. Co.*, 40 Mont. 508, 107 Pac. 499.) Section 2812 speaks in the alternative and is not restricted to the class of cases mentioned, but includes in its condemnation "every person who shall recklessly * * * use * * * blasting powder" in such manner as to "endanger" any human being. "Reckless" means "inattentive to duty, neglectful, indifferent; rashly negligent." (Webster's Internat. Dictionary.) The mere ·fact that the law as declared in the statute is applicable to a case of another character does not detract from its applicability here. (*Hardesty* v. *Largey Lumber Co.*, 34 Mont. 151, 160, 86 Pac. 29.)

It is true that, as originally enacted, the title to the Act in which the provisions of section 2812 were incorporated was not sufficiently broad to include ·the condemnation of the "reckless use" of powder by a purchaser, as that title denominated the Act as "regulating the manufacturing, keeping, storage, transportation and sale of explosives." For this reason the defendant asserts that section 2812 violates section 23 of Article V of the Constitution, and therefore should not have been given. The Act, however, was passed in 1895, and has been carried forward into our Codes of 1895, 1907, and 1921, without change. These Codes have been regularly adopted by the legislature, with this Act incorporated therein, without reference to its original title; the subject matter of section 2812 was one upon which the legislature had power to legislate, and the defect pointed out existed only in the discarded title; therefore the defect was cured by its adoption into the Codes, and it has been a valid enactment, at least since the passage of one or more of the Acts adopting and approving our Codes (59 C. J. 892, 893, and cases cited thereunder), and was the law at the time this case was tried.

"A criminal statute * * * is enacted for the benefit of the public. * * · * Every member of the public is covered by the protecting influence of the obligation. If one suffers injury * * * by a neglect of this duty, he has a

remedy, not because our general and criminal laws are divided in their operation, * * * but because as one of the public in a peculiar situation, he suffers a special injury, different in kind from that of the public generally." (*Bourne* v. *Whitman*, 209 Mass. 155, 95 N. E. 404, 406, 35 L. R. A. (n. s.) 701. See, also, *Conway* v. *Monidah Trust*, 47 Mont. 269, 132 Pac. 26, L. R. A. 1915E, 500.)

No error was committed in giving that portion of the instruction based on section 2812, or in instructing the jury as to the liability of the corporation defendant for the acts of its agents in the course of their employment.

Further, we find no merit in the contention that section 2812 was repealed (by implication) by the enactment of Chapter 129, Laws of 1917, now sections 2786 to 2804, Revised Codes 1921; that Act did not deal with the subject matter of section 2812.

There remains the objection to the inclusion in the instruction of the penalty provided for the violation of any of the provisions of the Act in which section 2812 appears. Counsel for the defendant assert that this inclusion constitutes prejudicial error, as "this action does not involve the violation of the statute in a criminal way," but do not call our attention to any rule or decision to the effect that, when properly instructing the jury that an act or omission constitutes a crime and that act or omission is made the basis of a demand for exemplary damages, the penalty should not be included in the instruction.

The plaintiff contends that to merely classify an act as a misdemeanor "tells a very partial story as to the dangers of using giant powder," and that the jury should be advised as to the gravity with which the legislature viewed the crime it defined, but again we are cited no authorities on the subject. It would seem that the question is one of first impression.

While the fact that the act of which complaint is made is declared to be a criminal offense may be taken into consideration in determining negligence and in resolving the question as to whether the act was one of oppression (*United States*

v. *Deaver,* (D. C.) 14 Fed. 595), the jury was not called upon to determine the criminal liability of the defendant or what punishment could be inflicted upon it in a criminal action. The only punishment with which the jury was concerned was that permissible in a civil action, i. e., the award of exemplary damages; on this subject, the severe punishment which might be inflicted on conviction of any provision of the Act, including as it does many offenses which might be committed by the use, or abuse, of dynamite and other explosives, was no guide to the jury in its deliberations. We therefore condemn the inclusion in the instruction of the penalty as error; but it does not follow that such error commands a reversal of the judgment.

Even under the common law, "where it appears, from the evidence, that the verdict is so clearly right that had it been different the court should have set it aside, such verdict will not be disturbed merely for the reason that there is error found in the instructions." (1 Brickwood, Sackett on Instructions, 160, citing *Hazen & Lundy* v. *Pierson,* 83 Ill. 241; *Burling* v. *Illinois Central Ry. Co.,* 85 Ill. 18; *Phillips* v. *Ocmulgee etc.,* 55 Ga. 633; *People* v. *Welch,* 49 Cal. 177.) Under our Code we are commanded to disregard error which does not affect the substantial rights of the parties, and it is declared that no judgment shall be reversed for such error. (Sec. 9191, Rev. Codes 1921.) The burden of showing reversible error is on the party asserting it (*Territory* v. *Scott,* 7 Mont. 407, 17 Pac. 627; *Harris* v. *Barnhart,* 97 Cal. 546, 32 Pac. 589; *Klink* v. *People,* 16 Colo. 467, 27 Pac. 1062; *Coffin* v. *Taylor,* 16 Or. 375, 18 Pac. 638), and no judgment will be reversed for error in the instructions as to damages, unless the verdict shows that the error affected the result (*Keeler* v. *Herr,* 157 Ill. 57, 41 N. E. 750; *Myers* v. *Wright,* 44 Iowa, 38; *Hubbell* v. *Blandy,* 87 Mich. 209, 49 N. W. 502, 24 Am. St. Rep. 154; *Marcum* v. *Missouri, K. & T. Ry. Co.,* 139 Mo. App. 217, 122 S. W. 1148).

Exemplary damages are awarded as punishment for the commission of a malicious, wilful, or wanton act, and for the pur-

pose of deterring the wrongdoer, and others, from perpetrating similar acts in the future. When we consider the evidence justifying the inference that the defendant intended to continue its blasting operations from year to year by the employment of the method described, with knowledge that each year it would cause damage to the Cashin house, and that Providence alone could prevent injuries to persons residing there, and consider all the elements that may be taken into consideration in fixing the amount of exemplary damages, it seems to us that the award of $750, or one-half of the amount asked by the plaintiff, does not denote immoderation or unfairness on the part of the jury. As there is no measuring stick to be applied in making such awards, it would be extremely difficult to show that any award made was affected by the erroneous instruction; but, on the other hand, considering the circumstances disclosed, it cannot be said that the award made indicates that the jury was influenced to the slightest degree by being advised of the severe penalty attached to a violation of the statute resulting in a criminal prosecution.

Error is predicated on the court's refusal to give certain offered instructions; these specifications have been considered and found to be without merit.

Finding no reversible error in the record, the judgment must be affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.