BERNICE RASMUSSEN, ADMINISTRATRIX, APPELLEE, V. JOHN BENSON, APPELLANT.

280 N. W. 890

FILED JULY 8, 1938. No. 30073.

*Edmund P. Nuss* and *P. E. Boslaugh,* for appellant.

*Carl T. Curtis* and *King & Bracken, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

. DAY, J.

This is an action for damages arising from the sale of a sack of poisoned bran. Benson held a farm sale and sold a portion of a sack of poisoned bran to Rasmussen. This sack was not labeled "Poison," and Rasmussen fed the bran to his dairy cows and other live stock. As a result, five of his ten cows died and five were so poisoned as to be sick and rendered unfit for further dairy purposes. A hog and some twenty chickens also died as a result of the poison in this feed. Rasmussen lost his dairy route, and his business which he had built up during ten years, and which was his only means of livelihood for himself and his family, was destroyed. It is alleged that as a result of the great mental and nervous shock caused by the poisoning of his live stock, the subsequent loss of his dairy business, and the fear of communicating the poison to his dairy customers, he became fatally ill and died. According to the medical testimony he died of a decompensated heart caused by an excessive emotional disturbance. Rasmussen himself commenced this action, but at his death it was revived and continued by his wife as administratrix of his estate.

An opinion was formerly adopted in this case, to which reference is made for additional facts not deemed necessary of repetition. *Rasmussen v. Benson,* 133 Neb. 449, 275 N. W. 674. An oral argument was allowed on the motion for rehearing, and additional briefs were filed by the parties. After this careful consideration the court is of the opinion that, under the circumstances of the case, Ras-

mussen was entitled to recover for damages occasioned by loss of his live stock and the loss of the dairy business. This court erred, complains the appellant, in failing to distinguish between negligence with respect to his property and negligence with respect to his person. In other words, even if the recovery for damage to the property is correct, Benson insists that the law does not justify a recovery for the sickness and death of Rasmussen. The verdict was a general one for $3,500 and cannot be segregated by this court.

Is the appellant liable for the decompensated heart caused by the great mental and nervous shock resulting from his negligence, which proximately caused the sickness and death of the deceased? There is sufficient evidence to sustain the verdict of the jury that the appellant was negligent in the sale of the unlabeled, poisoned bran in such a way that it was likely to be used for feed for live stock. The bag of bran was sold from a hayrack with other small articles as a part of a farm sale, but there is dispute in the evidence as to what the auctioneer said, as agent for the appellant, with reference to the bran itself when it was offered for sale. The witnesses for the appellee testify that the auctioneer stated to Rasmussen and the others at the sale that the sack contained bran, and that it would make some cheap feed for cows. Witnesses for Benson state that they do not remember such a statement, and that the auctioneer said to the crowd: "I think it is bran," and it was sold that way. There is no dispute in the evidence as to whether or not the bran was labeled "Poison" in any way. Benson himself testifies that one moonlight night, about March 1, 1935, he picked up a piece of cardboard from the floor of the barn, and, not knowing what it was, carried it to the house so that he might look at it in the light. When he reached the kitchen he discovered that he was carrying the red "poison" label which had become detached from the sack of bran, and instead of replacing it on the sack he put it in a drawer of the kitchen cupboard. The tag is in evidence.

Benson was conducting this sale personally and through his agents. At his request a nephew had made arrangements for the auctioneer and clerks, and at his request, or at least with his acquiescence, his nephew and some neighbors picked up and arranged the items for the sale. The nephew and another who prepared for the sale were present when the bran was sold. Benson was not actually present at the time of the sale of the bran, but he had been present just before, and he returned to the scene of the sale shortly afterwards. There is proof that he interfered with the progress of the sale when the auctioneer was selling some corn for seed corn, and stated it was not good for seed corn, but would serve all right for feed. The evidence amply supports the allegation that he sold the bran at least through his agents. Even the appellant asserts in his brief for rehearing that it was sold in a "gunny sack" as "bran for stock."

After the sale was over Rasmussen returned to his home, and fed the bran purchased at the sale to his ten dairy cows and other live stock that night. The next morning, after he had milked and delivered the milk to his customers, the cows became very sick. As soon as he discovered this, Rasmussen telephoned all the customers and went by automobile to notify those without telephones. Later a chemist tested the bran and found that it was 1.75 arsenic, or 122.5 grains to a pound, while five grains is sufficient to kill a cow. According to this witness, time does not affect the strength of the poison. The veterinary who cared for the cows confirmed the finding of arsenic in the bran. According to the testimony, there was more than enough arsenic contained in that sack of bran to kill all the people in the adjacent town of Minden where the customers of the deceased lived. We are confirmed in the belief that in this case the appellant was negligent in the sale of poisoned bran for stock food, or in selling it unlabeled so that it might be used as such. In this case the negligence of the appellant caused the loss of Rasmussen's cows and other live stock, together with the loss of his dairy business. In

addition to the loss of personal property, Rasmussen suffered a decompensation of the heart caused by the severe mental stress and shock, which resulted in his death. Rasmussen started his dairy business in 1926 with three cows, and at that time he owed the bank about $2,000. He had developed his business until he had paid the debt to the bank, increased the number of cows to ten or twelve, and gained over fifty customers to whom he was selling from seventy-five to eighty quarts of milk a day. After the cows became sick he was naturally fearful lest the milk which he delivered to his customers from the poisoned cows would endanger the lives of many people to whom he felt a responsibility because they were customers of the dairy. The deceased was under such a strain that when the rendering plant came to get the dead animals he fainted and fell down in the yard. He took to his bed and was later in the hospital two different times. The bran was sold and fed to the cows on May 15, 1935, and Rasmussen died on February 20, 1936. He was not able to do any work from May 23, 1935, to the time of his death, although fully able to do so prior to the first date. Medical experts testified as to his health before and after the poisoning of the cows. They testify that his condition, as well as his death, was due to a decompensation of the heart caused by mental shock and emotional upset. Is the appellant liable for the full consequences of his negligent act in selling unlabeled, poisoned bran in such a way that it was likely to be fed to dairy cows whose milk was being delivered to the many customers of Rasmussen's dairy? It was only by extraordinary efforts that the deceased was able to prevent this. His cows were destroyed; his dairy business which he had built up during ten years was wiped out; he was deprived of his livelihood for himself and his family; and his was the responsibility of poisoning many people who consumed the milk from the poisoned cows. According to the evidence, his death resulted from the circumstances arising from the negligent sale of the poisoned bran. In such a situation is recovery limited to the value of the cows as personal prop-

erty? Is the appellant's liability for his negligence limited to the value of the personal property and not extended to the damage actually resulting from that negligence?

The deceased feared that he might poison some of his customers to whom he delivered the milk from the poisoned cows. It is not so important whether or not this actually happened as it is that he had some foundation for the fear, and suffered a severe emotional upset because of it. It is a common belief among people that arsenic poison may be communicated through milk. It has been stated in authoritative works that traces of arsenic have been found in cows' milk after giving the cows relatively large but not fatal doses of the poison, and that traces of arsenic have been found in mothers' milk where there has been medication. 3 Hefter, Handbuch der Experimentelle Pharnokologie, Part I, p. 482.

Another authority states that arsenic is excreted very slowly. It appears in the urine and feces within twenty-four hours, but only about one-fifth is eliminated in this way, and the rest may be excreted a month later. Fatal intoxications are said to have been found in a child, communicated to it from its mother's milk. Cushing, Pharmacology, Edmund and Gunn's Edition (1936) p. 194.

It is stated by another that a mother who has taken arsenic communicates the poison through her milk to her child. "That the milk of women who are taking arsenical preparations medicinally contains arsenic was known as early as 1838, when Thomson recognized its presence after the use of the iodid. A woman was given 0.008 gm. (0.012 grain) of arsenic daily for six days; 100 gm. of her milk were found to contain 0.001 gm. of arsenic. Two cases are recorded of the fatal poisoning of nursing infants to whose mothers arsenic had been given with homicidal intent. In one of these Silliman obtained decisive evidence of the presence of arsenic in the stomach and liver. In the other case it was only when a second attempt was made, about fifteen months later, to poison the mother, that the cadaver of the infant was exhumed and found to contain notable quantities

of arsenic. In a case of alleged homicide of an infant of two months, in whose cadaver Brouardel and Pouchet found a quantity of arsenic estimated at 0.005 gm. (0.8 grain), they expressed the opinion that the poison found might have originated from arsenical preparations taken by the nursing mother." 4 Witthaus and Becker, Medical Jurisprudence, Forensic Medicine and Toxicology (2 ed., 1911) p. 421.

These statements from the authorities are given this attention because appellant has taken the position, both in the briefs and in the oral argument, that he was not responsible for the damages resulting from his negligence in this case. The evidence in this case refutes the idea that the deceased was an unduly nervous person given to worry and that a normal person would not have reacted in like manner. The record establishes the fact in this case that there was ample cause for an emotional upset, and the medical experts testify that the condition of deceased was caused by the mental disturbance.

In order that it may not be misunderstood, in this case the deceased was confronted with a series of disturbing facts. He had worked long and hard to build up this dairy business from a very small beginning. It was entirely destroyed by the negligence of the appellant. The business was his livelihood and that of his family. He was fearful lest he had poisoned a considerable portion of the whole community in which he lived with the milk from the poisoned cows. He fed the cows some of the poisoned bran in the evening, and he milked them and delivered the milk to his customers the next morning. The cows were noticed to be sick later in the forenoon by his wife, and Rasmussen then made extraordinary efforts to prevent the poisoning of his customers. He had been accustomed to doing manual labor before this, but collapsed when the men came from the rendering plant to take away the dead live stock. He was confined to the hospital from May 25 to May 29, 1935, and again from October 5 to October 9. He was confined to his bed most of the time, although he occasionally

sat up. He was assisted up and down stairs, and was taken to the doctor's office. However, he was unable from that date until his death to do any work of any kind, and he died on February 20, 1936, or a little more than ten months from the date of the sale. The evidence in this case establishes that the death was caused solely by the negligence of the appellant.

This court has permitted recovery for the physical consequence of fright or shock in certain cases. In *Netusil v. Novak*, 120 Neb. 751, 235 N. W. 335, and in its second appearance here, 122 Neb. 749, 241 N. W. 531, recovery was allowed for physical injury resulting from fright and shock by an attack of a vicious dog which barked but did not bite, causing the woman attacked to swoon in the street. The dog was owned by one who owed the attacked woman the legal duty to pass his house in safety upon the street abutting his property.

The *Netusil* case followed and cited *Hanford v. Omaha & C. B. Street R. Co.*, 113 Neb. 423, 203 N. W. 643. In the *Hanford* case a woman was waiting in the street to board a standing street car when a following street car crashed into it, causing her to jump backward to avoid a collision. There was no impact of either car with her body, but she sprained her back in jumping backward. The rule is well established by these authorities that a physical injury resulting from an emotional upset produced by the negligence of another creates liability for damages.

This case can be made more difficult and the opinion seem to reach the wrong conclusion by a misconception of the facts in the case. If the facts are different than presented in this case, different reasoning and a different conclusion might be necessary. This is not an allowance of a recovery for worry alone. The terror and the situation that confronted the deceased caused his illness and death. It was accompanied by this serious injury, a physical one. There is a difference of authority, and one doctrine is that there can be no recovery for fright unaccompanied by a contemporaneous physical injury. These cases follow the

rule announced in *Mitchell v. Rochester Ry. Co.*, 151 N. Y. 107, 45 N. E. 354. The rule is also announced in *Louisville & N. Ry. Co. v. Roberts,* 207 Ky. 310, 269 S. W. 333, that no recovery can be had for physical injuries due to fright without physical impact. But there are other jurisdictions where there may be a recovery for physical injuries although the fright is unaccompanied by a contemporaneous physical injury. See *Cashin v. Northern P. R. Co.*, 96 Mont. 92, 28 Pac. (2d) 862, where damages for actual injury to nervous system resulting from fright and mental shock were allowed although not accompanied by a contemporaneous physical injury. See, also, *Chiuchiolo v. New England Wholesale Tailors*, 84 N. H. 329, 150 Atl. 540, and *Frazee v. Western Dairy Products*, 182 Wash. 578, 47 Pac. (2d) 1037. This jurisdiction adopted that rule in *Hanford v. Omaha & C. B. Street R. Co., supra,* and *Netusil v. Novak, supra.* These were not odd or unusual decisions, but are supported by logic and authority.

In *Watson v. Dilts*, 116 Ia. 249, 89 N. W. 1068, it was said: "Recovery may be had for nervous prostration from fright, caused by defendant's trespassing, by stealthily entering, in the night-time, plaintiff's home, this being a physical injury, and the proximate result of the wrong." In *Sundquist v. Madison Rys. Co.*, 197 Wis. 83, 221 N. W. 392, citing *Pankopf v. Hinkley,* 141 Wis. 146, 123 N. W. 625, it was held that liability may be based on physical disability resulting from extreme fright without bodily injury. John E. Hallen, Professor of Law, Ohio State University, in 19 Virginia Law Review, 271, states: "The older negligence rule which denied recovery without impact now seems to have become a minority doctrine, and courts which still adhere to that rule are quick to find some slight impact, and to permit recovery, although it seems apparent that the injuries were caused by the fright and not by the touch. It is predicted that if we require the plaintiff to be in danger of receiving a physical impact or to fear for her own safety, many courts will be equally quick to find these elements." The right to recover is placed squarely

on *Hanford v. Omaha & C. B. Street R. Co., supra,* and *Netusil v. Novak, supra.*

Complaint is made that injury was not forseeable in this case. In the *Hanford* case this court held that a tort-feasor was liable for injuries although they were not foreseeable. This rule is stated in 2 Restatement, Torts, sec. 461. This is not an unusual or unexpected result of the appellant's negligence anyhow. The tort-feasor seldom contemplates the amount of the resulting injury, and that he does not anticipate the extent of the damage does not bring the case within that rule. There is no error in the record and the judgment is not disturbed.

AFFIRMED.

CARTER, J., dissenting.

I am unable to agree with the court's opinion filed in this case or with the result arrived at by the majority. I agree that the defendant was negligent in the sale of the poisoned bran, under the circumstances detailed in the court's opinion, and that a judgment for damages to the live stock and dairy business of the deceased can be sustained. This dissent is devoted only to that part of the opinion which holds the defendant liable for the death of Rasmussen alleged to have been caused by worry and mental shock resulting from the loss of his cattle and damage to his dairy business.

The majority opinion stresses the point that a recovery of damages for negligence may be had without physical impact. I agree with this general statement of the law, but I submit that it is not the controlling factor in disposing of this case.

The first point that I desire to make is that the negligence of the defendant in this case was not the proximate cause of the death of Rasmussen; that it could not have been reasonably foreseen that Rasmussen's death would be caused by defendant's negligent act in selling a sack of poisoned bran as stock feed.

A noted writer on the subject states the rule as follows: "The courts have for centuries persisted in stating and

purporting to apply the 'natural and probable consequences' formula to determine whether consequences were sufficiently 'proximate' to conduct as to make it just to hold the defendant liable therefor. Many still insist that there can be no recovery if the harms complained of were not reasonably foreseeable and therefore probable. It would be most astonishing that such a formula should persist for so long if there were no validity whatever to it. The secret is revealed by the frequent qualification of the rule that *the exact manner in which the harm is sustained need not be foreseeable.* The explanation is that the courts are perfectly accurate in declaring that there can be no liability where the harm is unforeseeable, if 'unforeseeability' refers to the general type of harm sustained." Harper, Treatise on Law of Torts, 14. (Italics ours.)

The rule is aptly stated in 45 C. J. 913, as follows: "In addition to the requirement that the result should be the natural and probable consequence of the negligence, it is ordinarily held, subject to limitations hereinafter stated, that the consequence should be one which, in the light of attending circumstances, an ordinarily prudent man ought reasonably to have foreseen might probably occur as the result of his negligence. This rule is usually given in connection with a statement of the well-established rule requiring, as a condition of liability, that the injury should be the natural and probable consequence of the negligent act or omission for which a recovery is sought, and as explanatory of it, that is to say, the natural and probable consequences of a negligent act or omission are those which ought to have been foreseen, or could reasonably have been anticipated. A person is bound to anticipate the reasonable and natural consequences of his own conduct, if he was informed, or by ordinary observation would have been informed, of the facts and circumstances attending the negligence. But if injury could not reasonably have been anticipated as the probable result of an act of negligence, such act is either the remote cause or no cause of injury. There is neither a legal nor a moral obligation to guard against

that which cannot be foreseen. The test is what could be foreseen in the light of common or ordinary experience, for the rule of anticipation or foreseeableness is one of practical application, and not of philosophical or metaphysical speculation in causation."

Can it be said that a reasonable and prudent person would foresee that the sale of poisoned bran as feed for live stock would, as a natural result of his act, result in such worry and excitement to the owner of the live stock that he would become physically incapacitated and eventually die? Harm to the person of the deceased would not be anticipated by the most reasonable of men on such a state of facts. Reasonable men are presumed to foresee the usual, natural and probable results of their negligent acts, and for these they are held liable by the law. But the death of a person is not a usual, natural and probable result of the sale of poisoned bran for stock feed. And while such negligent act may have contributed to the death of the deceased, or even caused it, there is no liability.

An authoritative text states the rule as follows: "If the actor's misconduct is negligent and not intentional, the actor cannot be liable to another harmed thereby, no matter how directly, unless his conduct was negligent toward the other as involving an unreasonable risk of harm to him, or to a class of which he is a member. * * * Therefore, if a defendant's conduct, although involving a realizable and unreasonable risk of causing harm to certain classes of persons, involves no such risk of harm to any class of persons of which the plaintiff is a member, the fact that it causes harm to the plaintiff cannot make the defendant liable to him, and this is so, although the causal relation between his conduct and the harm is sufficient to make it the legal cause of the harm, had the defendant's conduct been negligent toward the plaintiff." Restatement, Torts, sec. 430, comment (b).

In *Bryant v. Beebe & Runyan Furniture Co.*, 78 Neb. 155, 110 N. W. 690, the court said: "In order to warrant a finding that a negligent act or omission, not amounting

to a wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of such act or omission, and that *it ought to have been foreseen in the light of the attending circumstances.*" (Italics ours.)

In *Levin v. Muser,* 110 Neb. 515, 194 N. W. 672, a druggist sold oil of mirbane, labeled as such, but not labeled "poison," to plaintiff's intestate, who used it as a gargle and died from the effects thereof. This court denied a recovery because the inference may not "be reasonably drawn that his death was the natural or probable consequence of the sale of the oil without being labeled as a poison" to one having knowledge of its dangerous character.

In *City of Crete v. Childs,* 11 Neb. 252, 9 N. W. 55, we quoted with approval from *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S. 469, as follows: "Generally, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, the injury must be the natural and probable consequence of the negligence or wrongful act, one which ought to have been foreseen in the light of attending circumstances. The natural and probable consequences of a wrongful act or omission are not necessarily chargeable to the misfeasance or nonfeasance, when there is a sufficient intermediate cause operating between the wrong and the injury."

In *Johnson v. City of Omaha,* 108 Neb. 481, 188 N. W. 122, we said:

" 'A party is only answerable for the natural, probable, reasonable, and proximate consequences of his acts; and where some new efficient cause intervenes, not set in motion by him, and not connected with, but independent of, his acts, not flowing therefrom, and not reasonably in the nature of things to be contemplated or foreseen by him, and produces the injury, it is the proximate and dominant cause.' *Kitchen v. Carter,* 47 Neb. 776; *Merkouras v. Chicago, B. & Q. R. Co.,* 104 Neb. 491.

" 'An injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence

is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it, but for the interposition of some new, independent cause that could not have been anticipated.' *Chicago, St. P., M. & O. R. Co. v. Elliott,* 5 C. C. A. 347."

This court has consistently held, as demonstrated by the foregoing cases, that to recover for injuries resulting from negligence, it must appear that the injury was the natural and probable consequence of such act of negligence and that it ought to have been foreseen in the light of attending circumstances. The natural and probable consequences of the negligent sale of poisoned bran as stock feed, consequences which reasonably could be foreseen, are that the bran might be fed to live stock and cause them injury or death. But to say that the natural and probable consequences of a negligent sale of poisoned bran, consequences of which would reasonably be foreseen, are that the owner of live stock, to which the bran was fed, would suffer an emotional upset and mental shock that would cause his death is to me beyond all comprehension.

It is true that a recovery may be had for injuries resulting from fright or shock caused by the negligence of a person without a contemporaneous physical injury, under some circumstances. Such recovery, however, is limited to cases where the plaintiff is subjected to physical peril; there can be no recovery where the shock or fright is occasioned by worry and concern over a third person or over one's own property.

In *Waube v. Warrington,* 216 Wis. 603, 258 N. W. 497, it was held that there could be no recovery by the husband where his wife, who was frail in health, died as a result of prostration from fright, shock and excessive emotional disturbance caused by witnessing the death of her infant daughter, who was negligently killed in front of her home by defendant's automobile, the court saying: "Fundamentally, defendant's duty was to use ordinary care to avoid physical injury to those who would be put in physical peril, as

that term is commonly understood, by conduct on his part falling short of that standard. It is one thing to say that as to those who are put in peril of physical impact, impact is immaterial if physical injury is caused by shock arising from the peril. It is the foundation of cases holding to this liberal ruling, that the person affrighted or sustaining shock was actually put in peril of physical impact, and under these conditions it was considered immaterial that the physical impact did not materialize. It is quite another thing to say that those who are out of the field of physical danger through impact shall have a legally protected right to be free from emotional distress occasioned by the peril of others, when that distress results in physical impairment. The answer to this question cannot be reached solely by logic, nor is it clear that it can be entirely disposed of by a consideration of what the defendant ought reasonably to have anticipated as a consequence of his wrong. The answer must be reached by balancing the social interests involved in order to ascertain how far defendant's duty and plaintiff's right may justly and expediently be extended. It is our conclusion that they can neither justly nor expediently be extended to any recovery for physical injuries sustained by one out of the range of ordinary physical peril as a result of the shock of witnessing another's danger. Such consequences are so unusual and extraordinary, viewed after the event, that a user of the highway may be said not to subject others to an unreasonable risk of them by the careless management of his vehicle. Furthermore, the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor, would put an unreasonable burden upon users of the highway, open the way to fraudulent claims, and enter a field that has no sensible or just stopping point."

Recovery for the physical consequences of fright at another's peril has generally been denied. 11 A. L. R. 1143; 40 A. L. R. 986; 76 A. L. R. 686; 98 A. L. R. 405, and cases therein cited.

In *Bucknam v. Great Northern Ry. Co.*, 76 Minn. 373,

79 N. W. 98, where defendant had used abusive language directed to plaintiff's husband, resulting in shock and physical injuries to plaintiff, the court said: "Within these rules, the language of the defendant's servant to a third person was not the proximate cause of her sickness. She apprehended no danger to herself; at least, she could not reasonably do so. She was not in any place of peril. If an action of this kind can be maintained, we do not see why nervous and sensitive persons present at a riot or public disturbance cannot have a cause of action, if thereby they become nervous and sick, or suffer mentally, even if they do not receive bodily injury."

In *Sanderson v. Northern P. Ry. Co.*, 88 Minn. 162, 92 N. W. 542, the court said:

"The plaintiff's case is, then, one where it is sought to recover damages for personal injuries due solely to fright and grief because an attempt was made to put her children off the car, and one where there was no tort against her, and no fear on her part of any physical injury or personal violence. * * *

"From the consideration of the decisions of this court cited, we hold that there can be no recovery for fright which results in physical injuries, in the absence of contemporaneous injury to the plaintiff, *unless the fright is the proximate result of a legal wrong against the plaintiff by the defendant*. As already stated, the plaintiff's case is not within the exception, and it follows that the trial court rightly directed a verdict for the defendant." (Italics ours.)

It would seem to me that, if the cases uniformly hold that one may not recover for injuries caused by shock and emotional upset resulting from fright at another's peril, certainly there could be no liability where the fright and concern were from the injury or death of live stock. Is it possible that no recovery can be had for the death of a mother resulting from prostration and shock at seeing her little daughter killed under the wheels of a negligently operated automobile, while a recovery may be had where a dairy-

man worries over the death of his cattle to such an extent that it contributes to or causes his death? The question answers itself.

The rule is the same and there can be no recovery where the injuries are caused by shock and emotional upset resulting from worry and concern over one's own property. In *Murray v. Mace,* 41 Neb. 60, 59 N. W. 387, this court, in an opinion by Post, J., said: "The question is therefore fairly presented, whether the measure of damage in an action for a simple trespass to personal property includes injury to the feelings of the complaining party. The distinction must not be overlooked between cases like this, where the act charged is simply unlawful in the sense that it is a violation of the right of property, and those cases where the unlawful act was inspired by fraud, malice, or like motives. As to those last named, the question is free from doubt. In all such cases mental suffering is a legitimate element of damage. * * * But in cases of trespass, where personal property is taken and carried away, in the absence of fraud, malice, or other aggravating circumstances, the measure of damage is compensation to the plaintiff for his loss, which is, as a rule, the value of the property with such incidental damage as is shown to be the natural and proximate result the wrong charged. * * * It is believed that no precedent can be found in the reports for the allowance of damage on account of injury to feelings in actions of this character. It is certain that we have been referred to no such case, nor have we found any during a careful examination of the question."

In *Henderson v. Weidman,* 88 Neb. 813, 130 N. W. 579, Letton, J., speaking for this court, said: "Compensation for mental suffering of the injured party is a legitimate element of damage in actions for trespass to property, where the unlawful act is inspired by fraud, malice, or like motives. But, in cases where the wrong consists in the taking or destruction of personal property without fraud, malice, or other aggravating circumstances, the measure of damage is compensation for the plaintiff's loss."

And in *Gilbert v. Rothe,* 106 Neb. 549, 184 N. W. 119, this court, in an opinion by Rose, J., held: "In the absence of fraud, malice or other aggravating circumstances, mental suffering is not an element of damages for a trespass resulting in a sheriff's temporary seizure of personal property."

In the case of *Barnett v. Collection Service Co.,* 214 Ia. 1303, 242 N. W. 25, the court said: "The rule seems to be well established that, where the act is wilful or malicious, *as distinguished from being merely negligent,* recovery may be had for mental pain, though no physical injury results. In such a case the door to recovery should be opened but narrowly and with due caution." (Italics ours.)

In *Anderson v. Sloane,* 72 Wis. 566, 40 N. W. 214, the court said: "No damages should be allowed for injury to the feelings of the plaintiff. Injury to the feelings is not a legitimate item of damage in any action for an injury to personal property, when such injury is not malicious and is not accompanied by insult." See, also, 17 C. J. 836, and 8 R. C. L. 528, sec. 82, and cases therein cited.

In the instant case, the defendant, in selling the bran as feed for live stock, was under no duty to the deceased, in so far as guarding against physical injury to him was concerned. What wrong did the defendant do to the person of Rasmussen when he sold the poisoned bran as stock feed? He did not sell the bran for human consumption and no reasonable person would anticipate its use for any such purpose. His duty was, therefore, to deliver a sack of bran that was fit for the purposes for which it was sold and for which the parties contemplated that it might be used. For negligence in this regard defendant is liable for the natural and probable consequences of his act which reasonably might have been foreseen. The majority opinion relies strongly upon *Netusil v. Novak,* 120 Neb. 751, 235 N. W. 335, and *Hanford v. Omaha & C. B. Street R. Co.,* 113 Neb. 423, 203 N. W. 643. These cases are clearly distinguishable. In the *Netusil* case a recovery was allowed for physical injury resulting from fright and shock by an

attack of a vicious dog. The dog was owned by one who owed the attacked woman a legal duty to use due care that she might pass his house in safety upon the street abutting his property, and the opinion so states. The negligent act of the owner caused the attacked woman to fear for her own safety, which places her within the rule set out in this dissent. In addition thereto, the resulting consequences were natural and probable consequences of the negligent act and such as ought ordinarily to be foreseen by a prudent person. On all three essential points the case is different from the one at bar.

In the *Hanford* case a woman was waiting in the street to board a street car when a following street car crashed into it. She jumped back to avoid a collision and injured her back and a recovery was allowed therefor. It will be noted in this case, as in the *Netusil* case, that the defendant owed a duty to the plaintiff to use due care for her safety, and the opinion so holds. The negligent act of the defendant caused the woman to fear for her own safety and caused her to jump back in fear of injury to herself. And, also, the resulting injuries were the natural and probable consequences of the negligent act and such as ought to have been foreseen by an ordinarily prudent person. On all these points this case differs from the one at bar.

Liability for the death of Rasmussen does not follow in the instant case for three reasons: First, his death was not the natural and probable result of the sale of a sack of poisoned bran for stock feed and not such a consequence that would be foreseen by an ordinarily prudent person; second, the fright and emotional upset complained of were not brought about by fear of physical peril to himself, damages for fright occasioned by concern for a third person or for his own property not being recoverable; and third, the defendant owed the deceased no legal duty as to his physical safety that was breached by his negligent act.

I have failed to find a single case that sustains the holding of the majority. The court by its opinion extends legal protection to an interest far beyond the authorities and

will result in a flood of fantastic damage suits. I submit that actionable negligence is based upon a breach of duty, and that a breach of duty with respect to one's property cannot support an action for injury to the owner, no matter how intimate the causal connection between the act done and the bodily injury sustained, unless it be accompanied by a breach of duty with respect to the person of the owner. As was said by Cardozo, C. J., in *Palsgraf v. Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99: "Proof of negligence in the air, so to speak, will not do." I submit that this case is a "negligence in the air" case and that the result of the majority is not sustained by reason or authority.

EBERLY, J., concurs in the foregoing dissent.