BERNICE RASMUSSEN, ADMINISTRATRIX, APPELLEE, V. JOHN BENSON, APPELLANT.

275 N. W. 674

FILED OCTOBER 29, 1937. No. 30073.

450

*Edmund Nuss* and *P. E. Boslaugh,* for appellant.

*Carl T. Curtis* and *King & Bracken, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and CHAPPELL, District Judge.

MESSMORE, J.

This is an appeal from the district court for Adams county, wherein a jury returned a verdict for plaintiff below in the sum of $3,500.

Plaintiff's amended and supplemental petition alleges that defendant, at a farm sale on May 15, 1935, with the assistance of his agents and auctioneer, negligently offered for sale a part of a sack of bran as feed for live stock; that the bran had been treated for poisoning grasshoppers, and contained a poison known as arsenic; that defendant, knowing the bran contained poison, had removed the red tag which labeled the sack as poison and caused the bran to be sold as fit for consumption by live stock. Plaintiff further alleges that, relying upon the oral representations and warranties of defendant, made by him through his auctioneer, Alfred Rasmussen, a dairyman, purchased said poisonous bran, believing it to be ordinary bran, fit to feed to live stock, took the bran home and fed it to his live stock; that as a result certain of the live stock became ill and died, some cattle survived but were useless to Rasmussen in his business, and he lost his dairy business; that, by the negligent acts of defendant, Rasmussen was harassed, excited and injured, suffered an increased heartbeat, producing the decompensation of his heart, which resulted in a complete physical and nervous breakdown in health as a direct and proximate cause resulting from the negligence of defendant; that Rasmussen became totally disabled and was confined to a hospital on two separate occasions; that previous to this time his health was good. Plaintiff also alleges pain and suffering endured by virtue of the damages, causing a severe shock to Rasmussen; and then pleads in a second cause of action the death of Rasmussen, and prays damages for the benefit of the deceased's wife and family, as provided by law. The answer pleads the defense of contributory negligence and a general denial.

The facts developed by the evidence are as follows: Alfred Rasmussen, a dairyman for ten years, 44 years of age, living near Minden, Nebraska, having a milk business of approximately 50 customers and delivering about 75 quarts of milk a day, on May 15, 1935, purchased at public auction at the farm sale of the defendant a part of a

sack of bran which was not labeled, containing arsenic, a poison. A witness, Rudolph Jensen, testified that at the time of the purchase the auctioneer represented that the bran could be used for feeding live stock. This testimony was disputed to a great extent by witnesses for the defendant, which testimony was to the effect that defendant Benson was not near a rack from which certain articles were being sold at the time the bran was offered for sale, did not know that the bran had been offered for sale, had forgotten about the bran, made no representations about the bran, and was in no position to do so; that the farm sale was handled by others for him, he being a man 83 years of age. Rasmussen took the bran to his home, fed it to his live stock, and the live stock became sick. He obtained the services of a veterinary surgeon, but was unable to save his stock; five cows died, five became very sick and were useless to his business; one hog and 20 chickens died.

Plaintiff's evidence further discloses that Rasmussen's health was good; that he took care of his business, doing all things necessary and incident to carrying on a dairy business, prior to May 23, 1935. On that day, when the men came from the rendering plant to take away the dead stock, Rasmussen collapsed, became nervous and was taken to a hospital on May 25, 1935, where he remained until May 29; was again confined in a hospital from October 5 to October 9, 1935; from and after May 25 he was confined to his bed a great portion of the time, did sit up at times and was assisted up and down stairs when he went to the doctor's office, but was unable to do any work of any kind around the dairy farm, and employed labor to work in his stead; that at the time Rasmussen went into the dairy business, ten years before, he was indebted to the local bank in the sum of between $1,500 and $2,000; that at the time of his death he owned a complete set of machinery, ten cows, other live stock, an automobile, and was in debt about $200.

The medical testimony is rather lengthy and technical and, for the purposes of this opinion, only parts thereof

which point to Rasmussen's physical condition over the period of time, as alleged in the petition, will be stated. His family physician, who had known him for 21 years, who had served him for 18 years and who operated the hospital in which he was confined at the times herein mentioned, testified that he was in the hospital in the month of May, 1935; that Rasmussen was at that time very nervous, unable to sleep; his heart racing, pulse hard and fast, and he was almost irrational. This hospitalization was from May 25 to May 29, 1935. This physician further testified that he saw Rasmussen in July and August; that his mental condition was better, more rational; that he could sit down and talk about ordinary things; that his heart was still in a decompensated state; that witness had taken care of him in September a good deal of the time; that Rasmussen was brought to the hospital again on the 5th of October and there remained until the 9th; that the condition of his heart was bad in that the heart muscle was weak. This witness testified that in 1928 he operated on Rasmussen for hernia; that prior to the operation he had detected, in an examination, a leaky heart, but that subsequent to that date the heart was large but had become compensated and was able to take care of the ordinary work and strain necessary to carry on life; that he had not had occasion to serve Rasmussen from 1928 up to May 25, 1935; that he had seen him on various occasions carrying on his work as a dairyman and delivering milk, and that Rasmussen made no complaint; that on May 23 Rasmussen had a decompensated heart due to stress placed on it which could have been caused by shock and mental worry; that the immediate cause of the decompensation of the heart was either a great physical strain or a great mental shock.

The foregoing evidence was substantiated by Rasmussen's attending physician who was an associate of the family doctor. This witness testified that on May 25, 1935, he went to Rasmussen's home, examined him, found him in a very critical state, almost maniacal, with complete

nervous upset; that Rasmussen complained of pains in his right leg and both wrists, shortness of breath and insomnia; that the examination disclosed a cardiac fibrillation. The doctor testified that Rasmussen was taken to the hospital and treated by him from May 25 to May 29 for myocardial failure; that he attended him daily until June 2, 1935, and saw him frequently until October 5, 1935, at his home and three or four times a week at his office; that this condition was brought about, in the doctor's opinion, by extreme mental and physical shock, coupled with previous rheumatic endocarditis; that the profound shock to which Rasmussen had been subjected added a burden to his heart and was the immediate cause of his breakdown.

Plaintiff called another physician who qualified as an expert. In answer to the following hypothetical question: "Doctor, if a person had a compensated heart in 1928, the heart having been diseased because of rheumatic infection, but which was so compensated he was able to perform ordinary labor from that time until May, 1935, and then developed mitral cardial failure, could such failure be caused by mental shock or worry or an emotional upset?" the witness answered, "Yes, sir." The defendant called as a witness a physician whose testimony was in disagreement with that of the physicians called by plaintiff, in that the witness testified that no amount of emotional strain could cause decompensation of the heart.

Appellant contends that the court erred in submitting to the jury an issue not raised by the pleadings, and in support of this contention states that this action is based on representations alleged to have been made by the agent or auctioneer of defendant, and that the defense was prepared accordingly, as shown by the evidence; that the court, in instruction No. 2, changed the issues, stating that the action was one for negligence, and instructed accordingly.

After a careful reading of the amended and supplemental petition, we believe that the allegations therein are sufficient to state a cause of action in negligence against the

defendant. It is true that the plaintiff claimed representations had been made that the bran could be used for feeding live stock. However, plaintiff did allege that the defendant wrongfully and negligently caused and permitted poisonous bran to be sold. The burden of proof was properly placed on the plaintiff by the court in instruction No. 2.

The court, after defining negligence in instruction No. 3, imposed a duty on the defendant in this language: "And if the defendant at the time of the sale knew, or in the exercise of proper care should have known, that he had poisonous bran and that it was, or was likely to be, in the articles offered at his sale and to be so assembled or put out by himself or by others assisting him in preparing for the sale, then it was his duty to exercise a high degree of care to see that prospective purchasers were properly notified or warned of the dangerous character of the bran."

We also find that instruction No. 1, offered by defendant, as to defendant's theory of the case, was properly refused for reasons hereinbefore stated. The instructions as a whole fully and fairly state the law applicable to the issues and the evidence. *Interstate Airlines, Inc., v. Arnold,* 127 Neb. 665, 256 N. W. 513.

In 49 C. J. 1045, it is said: "All persons who deal with deadly poisons or noxious and dangerous substances are held to strict accountability, and the highest degree of care must be used to prevent injury from their use." And in the same volume, at page 1046, it is said: "Where one who knows that a substance is poisonous carelessly or negligently leaves it where he knows, or has reason to know, or by ordinary care should know, that it may cause injury to some one ignorant of its character, he is liable for any injury resulting from such exposure."

The appellant contends that the court erred in not submitting to the jury the defense of contributory negligence. There is no evidence in the record that would in any manner point to negligence on the part of Alfred Rasmussen.

*Prairie Life Ins. Co. v. Heptonstall,* 105 Neb. 829, 182 N. W. 483.

Appellant contends that the court erred in not directing a verdict for the defendant, where the defendant asked for a dismissal of that part of plaintiff's case involving pain and suffering and recovery under Lord Campbell's Act. This action was originally started by Alfred Rasmussen, and at his death it was revived in the name of Bernice Rasmussen, as administratrix of the estate of Alfred Rasmussen, deceased. In the original petition Rasmussen prayed for damages for his pain and suffering, and in the amended and supplemental petition recovery is asked for pain and suffering.

This court in *Hindmarsh v. Sulpho Saline Bath Co.,* 108 Neb. 168, 187 N. W. 806, in an opinion by Flansburg, J., held that an action started by a decedent for pain and suffering, loss of earning, etc., may be revived by his personal representative and joined in the same proceedings in an action for the wrongful death of said deceased, for the benefit of the widow and next of kin, by pleading them separately as two causes of action.

Defendant contends that the only possible connection between the purchase of the bran and Rasmussen's physical condition was a purely mental link—Rasmussen's anxiety and worry over the illness and loss of his cattle—that the mental condition was not naturally or proximately caused by the sale of the bran, and was a condition over which defendant had no control; that it was a new subjective force or condition which arose after the alleged negligence of the defendant, and was purely personal to Rasmussen.

In this case the evidence is strong and convincing that at the time the bran was fed to the live stock by Rasmussen he had an extreme shock which affected him physically and mentally. What caused this condition? The wrongful act of this defendant in the sale of the poisonous bran to this dairyman, who relied upon his live stock to furnish a living for himself and his family, caused the mental anxiety

and the shock which produced his pain and suffering and his death. There was no intervening cause, for the reason that, if the bran had not been poisoned, Rasmussen, according to the testimony of the experts, would have probably lived his expectancy. A wrong-doer is liable for all the injury directly resulting from his wrongful acts, whether their particular form or character could or could not have been foreseen by him. *Hanford v. Omaha & C. B. Street R. Co.*, 113 Neb. 423, 203 N. W. 643; *Netusil v. Novak*, 120 Neb. 751, 235 N. W. 335.

Whether or not the negligence of defendant is the proximate cause in this instance must be determined by ascertaining whether or not, in the natural and continuous sequence of events, there was a causal connection between such negligence and the mental and physical condition of Rasmussen, without some efficient, independent cause that was disconnected with such negligence and self-operative, intervening to produce such mental and physical condition in Rasmussen, and his death.

Defendant cites the case of *Spratlen v. Ish*, 100 Neb. 844, 161 N. W. 573, wherein it was held: "The proximate cause of an injury is that cause which, in the natural and continuous sequence, unaccompanied by any efficient intervening cause, produces the injury, and without which the result would not have occurred."

It is logical to say that in a continuing course of events, due to negligence on the part of the defendant, great shock and mental anxiety were caused to Rasmussen without any intervening or independent cause set in motion to contribute to the result of his physical and mental disabilities. His mental and physical disabilities were the continuing result of the negligence of the defendant. Did the facts constitute a continuous succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrongdoing and the injury? There may be a succession of intermediate causes, each produced by the one preceding, and producing the one following it. It must appear that the

458

injury was a natural consequence of the wrong act or omission. The new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it and adequate to bring about the injurious result.

In this case, the only cause that can be suggested as intervening between the negligence and the injury is Rasmussen's condition of mind, to wit, the shock and fright sustained. Could that be a natural, adequate cause of a complete physical breakdown, culminating in his death? A mental shock or disturbance sometimes causes injury or illness to the body, especially to the nervous system. Now, if the shock or fright was a natural consequence of what was brought about by the circumstances of the loss of Rasmussen's business,—the death of his live stock,— then such nervous shock was the proximate cause of Rasmussen's physical and mental condition that led to his death.

For the reasons given in this opinion, the judgment of the district court is

AFFIRMED.

CHAPPELL, District Judge, dissents.