Johnny Lee GATES, Kristina Gates, and Joseph Gates, infants, by their next friend and natural guardian, Stewart L. Gates, Peggy Merryman, and John Merryman, Appellants (Plaintiffs),

v.

Kelly D. RICHARDSON, Appellee (Defendant).

No. 84–21.

Supreme Court of Wyoming.

May 8, 1986.*

* Reassigned to Cardine, J., February 3, 1986.

William J. Flynn (argued), Green River, and E. James Burke of Hanes, Gage & Burke, P.C., Cheyenne, for appellants.

Ford T. Bussart (argued), and Lisa A. Botham, Rock Springs, for appellee.

Before THOMAS, C.J., and ROSE,** ROONEY,*** BROWN and CARDINE, JJ.

CARDINE, Justice.

This case arose from an accident when an automobile being driven by Kelly Richardson collided with a bicycle being ridden by six-year-old Johnny Gates. Although Johnny survived the accident, he is left with massive brain injuries from which he is unlikely to recover. In addition to Johnny's claim for medical expenses, pain and suffering, future lost wages and permanent disability, Johnny's mother, sister and brother sought damages from Richardson for the emotional distress they suffered from observing Johnny's severe injury at the scene of the accident. Johnny's father sought damages for loss of Johnny's future companionship, and his stepfather sought damages for loss of consortium with Johnny's mother stemming from her emotional injuries. The district court dismissed all counts, except Johnny's claim for personal injuries, on grounds that they failed to state claims upon which relief could be granted. We must decide whether the tort of negligent infliction of emotional distress and whether the claims for loss of consortium and companionship are actionable in Wyoming. We affirm in part and reverse in part.

## FACTS

"When considering a motion to dismiss a complaint, pursuant to Rule 12(b)(6), W.R.C.P., on the ground that it fails to state a claim on which relief can be granted, the facts alleged in the com-plaint are admitted and the allegations must be viewed in the light most favorable to the plaintiffs." *Moxley v. Laramie Builders, Inc.*, Wyo., 600 P.2d 733, 734 (1979).

Our statement of facts is drawn directly from the complaint.

On September 2, 1982, Johnny Gates was riding his bicycle in a school zone in Green River, Wyoming. As Johnny crossed the street, he was struck by Kelly Richardson's vehicle, was carried forward seventy-one feet, and knocked to the pavement. Johnny suffered massive brain injury resulting in a traumatic coma and loss of sight and hearing. When his complaint was filed in May of 1983, Johnny was still in a coma.

Johnny's brother Joseph, who was seven years old at the time, witnessed the accident. Johnny's mother, Peggy Merryman, and his thirteen-year-old sister, Kristina, did not actually see the accident, but they arrived moments after it occurred—in time to find Johnny in the street, severely injured and bleeding. Although these three family members were never in the zone of danger, their presence at the accident scene caused them all profound emotional shock, and at least one of them, Johnny's mother, expended $250 for medical services to cope with the shock. Neither Johnny's father, Stewart Gates, nor his stepfather, John Merryman, witnessed the accident or its immediate aftermath. But Mr. Gates and his former wife, Peggy Merryman, incurred over $100,000 in medical expenses as a result of their son's severe injuries. And Mr. Merryman lost the "society, companionship, consortium and services of his wife" because of her emotional distress.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Compensation for emotional distress is not a new concept in Wyoming. We have permitted recovery for emotional harm caused by false imprisonment, *Waters v. Brand*, Wyo., 497 P.2d 875, 877–878 (1972),

** Retired November 1, 1986.

*** Retired November 30, 1986.

malicious prosecution, *Cates v. Eddy*, Wyo., 669 P.2d 912, 921 (1983), and work-related stress, *Consolidated Freightways v. Drake*, Wyo., 678 P.2d 874 (1984); *Graves v. Utah Power & Light Company*, Wyo., 713 P.2d 187 (1986). We have discussed intentional infliction of emotional distress and have neither accepted nor rejected it as a tort. *Spurlock v. Ely*, Wyo., 707 P.2d 188, 192 (1985). This is the first case in which an action for damages resulting from negligent infliction of emotional distress has been directly presented to this court.

Traditionally a plaintiff could not recover for mental injuries unless they were linked to an actual or threatened physical impact caused by the defendant. W. Keeton, Prosser and Keeton on Torts § 54 at 362–364 (1984). The rule meant that a duty was imposed upon a defendant to avoid negligent impacts and threats of impact upon another, and he had to pay damages for both mental and physical harm if there was

a breach of that duty. There was no duty with respect to negligent acts which caused purely mental harm where there was no impact or threat of impact upon someone in the zone of danger.

The "impact" and "zone of danger" rules were held no longer necessary to state a claim for recovery for mental trauma in the state of California when its supreme court, in 1968, decided the case of *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316 (1968). The court held that a mother, who saw her infant child run down by a negligent motorist, could recover from the motorist for her emotional harm. The motorist's duty of care extended to the mother even though she was neither physically impacted nor within the zone of danger. In the eighteen years since Dillon, many state courts have accepted the proposition that a defendant's duty of care should extend to at least some plaintiffs who suffer purely mental injuries.[1] Before we can join these courts in

1. The impact rule has been abolished in the following states: Alabama: *Alabama Fuel & Iron Company v. Baladoni*, Ala.Ct.App., 73 So. 205 (1916); Arizona: *City of Tucson v. Wondergem*, 105 Ariz. 429, 466 P.2d 383 (1970); California: *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316 (1968); Colorado: *Towns v. Anderson*, 195 Colo. 517, 579 P.2d 1163 (1978); Connecticut: *Orlo v. Connecticut Company*, 128 Conn. 231, 21 A.2d 402 (1941); Delaware: *Robb v. Pennsylvania Railroad Company*, 8 Storey 454, 58 Del. 454, 210 A.2d 709 (1965); Georgia: *Goddard v. Watters*, 147 Ga.App. 722, 82 S.E. 304 (1914); Hawaii: *Rodrigues v. State*, 52 Hawaii 156, 52 Hawaii 283, 472 P.2d 509 (1970); Illinois: *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 75 Ill. Dec. 211, 457 N.E.2d 1 (1983); Iowa: *Watson v. Dilts*, 116 Iowa 249, 89 N.W. 1068 (1902); Kansas: *Clemm v. Atchison, Topeka & Santa Fe Ry. Company*, 126 Kan. 181, 268 P. 103 (1928); Louisiana: *Stewart v. Arkansas S.R.R. Company*, 112 La. 764, 36 So. 676 (1904); Maine: *Wallace v. Coca-Cola Bottling Plants, Inc.*, Me., 269 A.2d 117 (1970), overruled on other grounds, *Culbert v. Sampson's Supermarkets, Inc.*, Me., 444 A.2d 433 (1982); Maryland: *Green v. T.A. Shoemaker & Company*, 111 Md. 69, 73 A. 688 (1909); Massachusetts: *Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295 (1978); Michigan: *Daley v. LaCroix*, 384 Mich. 4, 179 N.W.2d 390 (1970); Minnesota: *Purcell v. St. Paul City Ry. Company*, 48 Minn. 134, 50 N.W. 1034 (1892); Mississippi: *First National Bank v. Langley*, Miss., 314

So.2d 324, 77 A.L.R.3d 570 (1975); Missouri: *Bass v. Nooney Company*, Mo., 646 S.W.2d 765 (1983); Nebraska: *Rasmussen v. Benson*, 135 Neb. 232, 280 N.W. 890, 122 A.L.R. 1468 (1938); New Hampshire: *Chiuchiolo v. New England Wholesale Tailors*, 84 N.H. 329, 150 A. 540 (1930); New Jersey: *Falzone v. Busch*, 45 N.J. 559, 214 A.2d 12 (1965); New York: *Battalla v. State*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961); North Carolina: *Kimberly v. Howland*, 143 N.C. 398, 55 S.E. 778 (1906); North Dakota: *Whetham v. Bismarck Hospital*, N.D., 197 N.W.2d 678 (1972); Ohio: *Schultz v. Barberton Glass Company*, 4 Ohio St.3d 131, 447 N.E.2d 109 (1983); Oklahoma: *St. Louis & S.F. Ry. Company v. Keiffer*, 48 Okla. 434, 150 P. 1026 (1915); Oregon: *Salmi v. Columbia & N.R.R. Company*, Or., 146 P. 819 (1915); Pennsylvania: *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970); Rhode Island: *Simone v. Rhode Island Company*, 28 R.I. 186, 66 A. 202 (1907); South Carolina: *Mack v. South-Bound R. Company*, 52 S.C. 323, 29 S.E. 905 (1898); South Dakota: *Sternhagen v. Kozel*, 40 S.D. 396, 167 N.W. 398 (1918); Tennessee: *Memphis St. Ry. Company v. Bernstein*, 137 Tenn. 637, 194 S.W. 902 (1917); Texas: *Hill v. Kimball*, 76 Tex. 210, 13 S.W. 59 (1890); Vermont: *Savard v. Cody Chevrolet, Inc.*, 126 Vt. 405, 234 A.2d 656 (1963); Virginia: *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214 (1973); Washington: *Frazee v. Western Dairy Products*, 182 Wash. 578, 47 P.2d 1037 (1935); West Virginia: *Lambert v. Brewster*, 97 W.Va. 124, 125 S.E. 244 (1924); Wiscon-

extending a limited duty of care to persons who suffer mental distress, we must balance the interests of the injured parties against the view that a negligent act should have some end to its legal consequences. *Hunsley v. Giard,* 87 Wash.2d 424, 553 P.2d 1096, 1102 (1976).

There is no magic formula which will tell us whether a defendant's duty should extend beyond the limits of the impact rule.

> "The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. * * * '[D]uty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." (Footnote omitted.) W. Keeton, supra, § 54 at 357–358.

Some of the key policy factors to be considered are: (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved. *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342, 83 A.L.R.3d 1166 (1976).

The first factor, foreseeability, has for many years been urged as the exclusive test of legal duty. A classic formulation of the test was offered in the 1932 English case Donoghue v. Stevenson, 1932 A.C. 562, quoted in W. Keeton, supra, § 54 at 358–359 and n. 20:

> " 'You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbor. Who, then, in law is my neighbor? The answer seems to

be—persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question.' "

Unfortunately this test is so vague that it has little practical value. Could defendant Richardson reasonably foresee that if he drove negligently he might run down a young boy on a bicycle and cause him severe physical harm? And could he also reasonably foresee that the boy's brother, mother and sister might come upon the scene shortly after the accident and suffer mental shock? Most people would probably agree that this mental shock is foreseeable to some extent.

> "[W]hen a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and thus may suffer serious shock." W. Keeton, supra, § 54 at 366.

But whether it is *reasonably* foreseeable is an entirely different question. The reasonableness qualification permits the courts to limit legal duties for policy reasons "while maintaining the illusion that a duty can be 'found' through a scientific legal test." W. Prosser, Palsgraf Revisited, 52 U.Mich.L. Rev. 1, 19 (1953). Instead of perpetuating the illusion, we prefer to set forth the legal duty and outline the policy principles which persuade us to recognize the legal duty and its limitations.

The second factor, the closeness of the connection between the defendant's act and the plaintiff's injury, is the flip side of the forseeability coin and is equally useless as an analytical tool. Thus we say that the more removed the injury from the defendant's act the less foreseeable it is that mental harm will result. But when we say the harm to the plaintiff is too remote to fall within a legal duty owed by the defendant, we are stating a conclusion, not applying a test.

The third factor, the certainty that an injury was really suffered, is worth pursu-

sin: *Pankopf v. Hinkley,* 141 Wis. 146, 123 N.W. 625 (1909).

ing. The district court held that the negligent infliction of mental distress did not state a claim in Wyoming because it would result in fraudulent claims and "extortionary litigation." In the worker's compensation context, we have recently reaffirmed our view that mental distress is more easily feigned than physical injury. *Graves v. Utah Power & Light Company,* supra, 713 P.2d 187. But this does not mean that all mental injuries are equally suspect.

" 'Where a mental injury occurs rapidly and can be readily traced to a specific event * * * there is a sufficient badge of reliability to assuage the Court's apprehension.' " Id. at 192, quoting *Townsend v. Maine Bureau of Public Safety,* Me., 404 A.2d 1014, 1018 (1979).

It is hard to imagine a mental injury that is more believable than one suffered by a person who witnesses the serious injury or death of a family member. As the relationship between the victim and the person witnessing the accident becomes more attenuated, the mental harm to that person becomes less plausible. But instead of barring recovery for all persons who witness the accident, we suggest the better solution is to distinguish between them. *Dillon v. Legg,* supra, 69 Cal.Rptr. at 77, 441 P.2d at 917–918. As we pointed out in *Nehring v. Russell,* Wyo., 582 P.2d 67, 79 (1978), doing away with an entire class of negligence action solely because some of the actions may be tainted by mischief is like "employing a cannon to kill a flea." Later in this opinion we will draw what we think is a reasonable line between the proper and improper plaintiffs to these actions.

We can envision cases where moral blame is an important factor in deciding whether a new legal duty is to be imposed. But this is not one of them. We think there is plenty of moral blame flowing from a tortfeasor who negligently injures or kills another to justify recovery by a family member who witnesses the event in horror.

"All ordinary human feelings are in favor of [a mother's] action against the negligent defendant [who kills her child]." W. Keeton, supra, § 54 at 366.

In its opinion letter, the district court refused to adopt the plaintiffs' cause of action because "[s]uch actions will result in a burden to the individual defendant" and "[i]mpose upon the public the unwarranted economic burden of increased insurance premiums to fund insurers' costs in paying and litigating such claims." According to the court, "[n]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere." While all of these observations are true, they do not take analysis very far. Any time a defendant must pay for his wrongs he is burdened. And any time he passes that liability on to his insurer, as anticipated in his contract with the insurer, the loss is felt by persons other than the defendant. Insurance is a loss spreading device by design. Increased insurance premiums are "unwarranted" only when we decide that a loss should fall on the innocent victim rather than the guilty tortfeasor, his insurer, and the public. Finally, the fact that legal causation must terminate somewhere does not mean it must terminate short of mental injuries.

The burden that most worries us is the burden that an overbroad liability would impose on our court system. The district court mentioned several administrative concerns in its opinion letter including the "[p]ossibility of multiplicity of suits" and the burden "to our court system because litigation will be increased." We do not see the multiplicity of suits as an overwhelming problem because if suits for emotional injury are limited to those injuries that arise from severe physical injury or death to another, the suits will most often be joined with the underlying actions based on the primary victims' physical injury—just as in this case. And, if the only purpose of our law was to unburden the court system, then we would reach the zenith of judicial achievement simply by closing the district courts to all litigants and allowing all wrongs to come to rest on innocent victims. In the state of Wyoming, the constitution guarantees that

"[a]ll courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay." Wyoming Constitution, Art. 1 § 8.

■ Our decision to impose limitations on this new tort action encourages us to adopt the action in the first instance. The district court held that adoption of the tort would

"[l]ead to further extensions of tort liability as plaintiffs with other relationships to the injured person [would] seek recognition of their losses."

That will not occur. We are perfectly capable of fixing limits and applying them when necessary. See *Dillon v. Legg*, supra, 69 Cal.Rptr. 82, 441 P.2d 922. We suspect recovery will not occur often in these cases; and when that does happen, it will ordinarily be minimal in amount. Given the relatively minor impact that recoveries in these cases would have on the defendants, the insurance industry, and the public, and given our general policy in favor of imposing the loss on the negligent tortfeasor rather than the innocent victim, we conclude that the tort of negligent infliction of emotional distress is actionable in Wyoming under the limitations which we will now discuss.

## LIMITATIONS ON THE TORT

*The Proper Plaintiff*

■ Some courts have set only minimal limits on the tort of negligent infliction of emotional distress. *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518 (1980); *Kelley v. Kokua Sales and Supply, Ltd.*, 56 Hawaii 204, 532 P.2d 673 (1975). They emphasize that juries can ferret out fraudulent claims. *Molien v. Kaiser Foundation Hospitals*, supra, 167 Cal. Rptr. at 839, 616 P.2d at 821. We agree that juries can recognize the frauds, but we also realize that the longer a nuisance suit survives the greater the illegitimate settlement value it acquires. If every bystander who sees a serious accident can bring a suit that survives summary judgment, a plague of nuisance suits could ensue despite the competence of our juries. Perhaps a limitation on the class of plaintiffs will prevent some persons with real mental injuries from recovering. That is a price we are willing to pay to prevent nuisance suits by the majority of bystanders who suffer no serious mental harms.

While we do not expect everyone to easily overcome the sight of violent injury or death to a loved one, we expect them to cope with the sight of violent injury or death to acquaintances or strangers. As the Court of Appeals of New Jersey stated when adopting this tort:

"[T]he interest assertedly injured is more than a general interest in emotional tranquility. It is the profound and abiding sentiment of parental love. The knowledge that loved ones are safe and whole is the deepest well-spring of emotional welfare. Against that reassuring background, the flashes of anxiety and disappointment that mar our lives take on softer hues." *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521, 526 (1980).

Some limitation on the class of plaintiffs is also justified by the potential burden on economic activity that an unlimited class could impose. W. Keeton, supra, § 54 at 366. A timely example is the space shuttle disaster. If every person who witnessed that catastrophic event and suffered mental harm could recover, the courts would be overwhelmed and such projects as the space shuttle would be laden with insuperable risk. As a society, we must tell most of those who observed the disaster and may have suffered because of it, that it is a suffering that is not compensable. In this we recognize that part of living involves some unhappy and disagreeable emotions with which we must cope without recovery of damages.

Having concluded that the class of plaintiffs must be restricted, we must set a rational and workable limit. The wrongful death statute, § 1–38–102, W.S.1977, Cum. Supp.1985, which we interpreted in *Wetering v. Eisele*, Wyo., 682 P.2d 1055, 1061–1062 (1984), supplies such a limit. The

legislature has expressed the community's policy that spouses, children, parents, and siblings may recover for wrongful death. *Wetering v. Eisele,* supra, at 1061–1062, § 1–38–102, W.S.1977, Cum.Supp.1985, and § 2–4–101, W.S.1977, Cum.Supp.1985. Others may suffer because of the death of a business partner or a friend. The legislature has said they may not recover. We think the limitation is reasonable, and its rationale applies with equal force to actions for negligent infliction of emotional harm. We hold, therefore, that the class of plaintiffs who may bring an action for negligent infliction of emotional distress consists of those who are permitted to bring wrongful death actions.

*The Scene of the Accident or its Aftermath*

■ Many of the courts that permit an action for negligent infliction of emotional distress limit it by the manner in which plaintiff perceived the harm to his loved one. The New Mexico Supreme Court requires that the plaintiff's shock

"result from a direct emotional impact * * * caused by the contemporaneous sensory perception of the accident, as contrasted with learning of the accident by means other than contemporaneous sensory perception, or by learning of the accident after its occurrence." *Ramirez v. Armstrong,* 100 N.M. 538, 673 P.2d 822, 825–826 (1983).

Massachusetts has a somewhat broader rule allowing recovery when the plaintiff

"either witnesses the accident or soon comes on the scene while the [victim] is still there." *Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295, 1302 (1978).

We think the Massachusetts rule is most consistent with the limitation's rationale, and it is hereby adopted.

The essence of the tort is the shock caused by the perception of an especially horrendous event. *Yandrich v. Radic,* 495 Pa. 243, 433 A.2d 459, 461 (1981). It is more than the shock one suffers when he learns of the death or injury of a child, sibling or parent over the phone, from a witness, or at the hospital. It is more than bad news. The kind of shock the tort requires is the result of the immediate aftermath of an accident. It may be the crushed body, the bleeding, the cries of pain, and, in some cases, the dying words which are really a continuation of the event. The immediate aftermath may be more shocking than the actual impact. Therefore, we hold that the plaintiff can recover if he observed the infliction of serious bodily harm or death, or if he observed the serious bodily harm or death shortly after its occurrence but without material change in the condition and location of the victim. Comment, Dillon Revisited, 43 Ohio State L.Rev. 931, 948 (1982).

*The Severity of the Injury to the Primary Victim*

■ As an assurance of genuine shock, the courts that have adopted the tort have generally agreed that the person claiming emotional harm must witness a *serious* accident or its aftermath. The primary victim must, in fact, be seriously injured or killed and the claimant must realize, at the time he witnesses the event, that the injuries are serious. E.g., *Versland v. Caron Transport,* Mont., 671 P.2d 583 (1983); Comment, Dillon Revisited, supra, at 948. Serious injury is the same as "serious bodily injury" as defined in the Wyoming Criminal Code. It means

"bodily injury which creates a substantial risk of death or which causes miscarriage, severe disfigurement or protracted loss or impairment of the function of any bodily member or organ." Section 6–1–104(a)(x), W.S.1977, Cum.Supp.1985.

We base this limitation on the common sense notion that people recover from serious shock quickly if it turns out to be a false alarm. See Comment, Negligently Inflicted Mental Distress: The Case for an Independent Tort, 59 Georgetown L.Rev. 1237, 1249–1251 (1971), for a discussion of this common sense idea in medical terms.

*Damages*

■ Among the courts that recognize the cause of action for negligent infliction

of emotional distress, there is a great deal of variation in the damages they allow. Some permit recovery for both special and general damages caused by emotional distress without any minimum showing of severity. *Leong v. Takasaki,* 55 Hawaii 398, 520 P.2d 758, 767, 94 A.L.R.3d 471 (1974). Others allow both general and special damages only if the emotional harm is serious, *Barnhill v. Davis,* Iowa, 300 N.W.2d 104, 108 (1981), or only if it is accompanied by objective physical symptoms. *Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300, 308 (1979); *Hunsley v. Giard,* supra, 553 P.2d at 1103. One court has permitted recovery only for substantial physical harm caused by the plaintiff's severe mental distress. *Dziokonski v. Babineau,* supra, 380 N.E.2d at 1302. Finally, it has been suggested that plaintiffs recover only their tangible economic losses stemming from their emotional harm. Miller, Emotional Distress Liability, 1979 U. Hawaii L.Rev. 1, 39.

The difficulty with these limited approaches is that they were often adopted as a guard against questionable claims in jurisdictions which liberally permit this cause of action. For instance, the Washington Supreme Court held in *Hunsley v. Giard,* supra, 553 P.2d at 1103, that the cause of action for negligent infliction of emotional distress was limited only by basic negligence concepts. The court did not restrict the class of plaintiffs, did not require that the primary victim suffer serious injury, and did not require that the plaintiff witness the accident or its immediate aftermath. To make up for this lack of restrictions, the court drew what it admitted was an artificial line and held that the plaintiff had to show mental suffering "manifested by objective symptomatology." Id.

The same balancing act characterizes the suggestion that the mentally harmed plaintiff recover only economic losses. The commentator who suggested this limitation was discussing the tort as it had developed in Hawaii, where the only restriction is that the plaintiff be located within a reasonable distance of the accident. *Kelley v. Kokua*

*Sales and Supply, Ltd.,* supra, 532 P.2d at 676.

One purpose of a damage limitation is the prevention of fraudulent claims. But, given the restrictions that we have imposed upon the cause of action, we do not perceive a need for further limitation upon damages. If the first three limitations are satisfied, we can be quite sure that the cause of action is within the realm of legitimacy. A further limit on damages is more likely to hurt a deserving plaintiff than it is to defeat a meritless claim. The rule we adopt provides that once an injured party has established duty, breach and proximate cause, he will be compensated for his entire damage so that he is made whole. *Hollon v. McComb,* Wyo., 636 P.2d 513, 516 (1981).

In its letter opinion the district court raised the possibility that juries will be unable to cope with the question of damages in these cases because they are too speculative. If that is true, then we should not allow damages for an emotional harm that is parasitic to physical injuries, that is suffered by persons in the zone of danger, or that arises in false imprisonment and malicious prosecution cases. In all of these cases we trust the jury to assess reasonable. damages for emotional harm. Juries that are influenced by passion and prejudice can be controlled by the courts. *Cates v. Eddy,* supra, 669 P.2d 912, 920–921 (1983).

We hold that a plaintiff's damages for emotional harm should not be limited by vague phrases such as "serious emotional harm" or "objectively determinable." As in any other negligence case, the plaintiff has the burden of proving damages. In many cases, the plaintiff will have to produce expert testimony to establish both causation and damages, but such testimony is not always necessary. See *Leong v. Takasaki,* supra, 520 P.2d at 767.

To summarize all of our limitations on this tort, we hold that the class of plaintiffs who may bring an action for negligent infliction of emotional distress consists of those who could bring, at least under some set of circumstances, a wrongful death ac-

tion for the primary victim's death. The primary victim must die, or suffer serious bodily injury as that term is defined in the Wyoming Criminal Code. The plaintiff must observe either the infliction of the fatal or harmful blow or observe the results of the blow after its occurrence without material change in the condition and location of the victim. Once these conditions are satisfied, the case can go forward under normal negligence principles. The defendant must have been negligent and his negligence must be the proximate cause of the plaintiff's mental injuries.

■ Johnny's mother, sister and brother are all members of the class of permissible plaintiffs. See *Wetering v. Eisele*, supra, 682 P.2d at 1061–1062. According to the complaint, they either witnessed Johnny's injury or observed the immediate aftermath without a material change in Johnny's condition or location. Johnny suffered serious bodily injuries which caused him protracted impairment of brain function. All three plaintiffs alleged damages for their mental harms. Their claims should not have been dismissed under Rule 12(b)(6), W.R.C.P.

## LOSS OF CONSORTIUM

■ John Merryman, as husband of Johnny's mother, claims loss of marital consortium. He alleges that he has been deprived of his wife's society and companionship as a result of Richardson's negligence. The trial court dismissed the claim because it held that Peggy Merryman's underlying cause of action for emotional injury was invalid. Since we recognize an action for negligent infliction of emotional distress, we reverse the trial court's dismissal of John Merryman's claim for loss of consortium. The law is well settled that a husband may maintain an action for loss of his wife's society, comfort and services resulting from injuries inflicted by a third person's negligence. *Druley v. Houdesheldt*, 75 Wyo. 155, 294 P.2d 351 (1956). Emotional injuries can support a claim for loss of consortium. *Molien v. Kaiser*

*Foundation Hospitals*, supra, 167 Cal. Rptr. 831, 616 P.2d 813.

## LOSS OF COMPANIONSHIP

■ Johnny's mother, Peggy Merryman, and his natural father, Stewart Gates, filed claims for loss of filial companionship, alleging that Richardson's negligence deprived them of the comfort and companionship of their son. Most courts hold that a parent cannot recover for the loss of a child's companionship, and we agree. See 67A C.J.S. Parent and Child § 152; Annot., 69 A.L.R.3d 553. The district court's dismissal of the claims for loss of filial companionship is affirmed.

## THE DISSENTING OPINION

The dissent states that there was a "change in law occasioned by the majority opinion," because

> "there may have been many other cases decided in Wyoming and not appealed to this Court [the supreme court] in which was applied the common law requiring impact or threat of impact before fright or mental injury could be considered as an element of damage."

The premise is faulty for there may *not* have been such cases, and the common law is not *settled* as is suggested. In any event, we are not changing law or overriding any precedent, but merely pronouncing what has always been the law in Wyoming. Because the initial premise is invalid, further response to the dissenting opinion is unnecessary.

In summary, we reverse the trial court's dismissal of the claims for emotional injury to Peggy Merryman, Kristina Gates and Joseph Gates, and John Merryman's claim for loss of consortium. We affirm the dismissal of the claims for filial companionship filed by Stewart Gates and Peggy Merryman. The case is remanded for further proceedings consistent with this opinion.

ROONEY, Justice, dissenting in the result and otherwise concurring in part and dissenting in part.

I dissent in the result, because I believe the change in law occasioned by the majori-

ty opinion should operate prospectively only. I concur in the change in law reflected in the majority opinion to allow recovery for negligently inflicted damages consisting only of mental injury or fright in the circumstances of this case, but I would restrict such recovery to spouses, parents, and children of the person who was seriously physically injured or killed, as held in *Saffels v. Bennett*, Wyo., 630 P.2d 505 (1981), and I would allow recovery by them only if they were at the scene of the incident to witness its occurrence.

## RETROSPECTIVE APPLICATION

Although it may be, as said in the majority opinion, that this is the first case

"* * * in which an action for damages resulting from negligent infliction of [only] emotional distress has been directly presented to this court,"

there may have been many other cases decided in Wyoming and not appealed to this Court in which was applied the common law requiring impact or threat of impact before fright or mental injury could be considered as an element of damages. Applying that set forth by Justice Cardine in *Adkins v. Sky Blue, Inc.*, Wyo., 701 P.2d 549 (1985), I believe the result in this case should be governed by the impact rule in effect at the time of the incident. In *Adkins*, Justice Cardine wrote in part at pages 551 and 552:

"The common law has served us well because it is flexible, able to grow and meet the requirements of changing conditions and a different society. There are times when change is necessary; but the doctrine of stare decisis is also important in an organized society. Change, therefore, should occur slowly, deliberately after much experience, and if possible so as not to affect vested rights or things in the past. Thus, it is said that:

" '[T]he courts may apply or effectuate common law principles in the light of altered or new conditions, and when the circumstances and conditions are different, in that the common law principles are unsuitable to new circum-

stances or conditions, the needs of society, or in conflict with public policy, the courts may make such changes or modifications as the situation requires.' (Footnotes omitted.) 15A C.J.S. Common Law § 13. See, *Irwin v. Coluccio*, 32 Wash.App. 510, 648 P.2d 458 (1982).

"Acknowledging that there ought to be an extreme reluctance to change the common law and recognizing the obvious benefits of the doctrine of stare decisis, yet on occasion it does become eminently clear that society has long passed beyond the point where an ancient doctrine remains viable. * * *

\*    \*    \*    \*    \*    \*

"Initially it was held that a court issuing an overruling decision had merely discovered and announced existing law; since the overruling case did not create new law, but merely recognized what had always been the law, such law would operate both retrospectively and prospectively:

" ' "[B]ut the modern decisions, taking a more pragmatic view of the judicial function, have recognized the power of a court to hold that an overruling decision is operative prospectively only and is not even operative upon the rights of the parties to the overruling case. As a matter of constitutional law, retroactive operation of an overruling decision is neither required nor prohibited." ' *Thome v. City of Newton*, 229 Kan. 375, 624 P.2d 454, 458 (1981) (quoting from Anno., Comment Note— Prospective or Retroactive Operation of Overruling Decision, 10 A.L.R.3d 1371, 1378 (1966)).

"We have held that

" '[t]here is no distinction drawn between civil and criminal litigation; a ruling may be prospective only and it may apply to the invalidity of statutes *as well as to the effect of a decision overturning long-established common-law rules;* the constitution neither prohibits nor requires retrospective effect and the federal Constitution

has no voice upon the subject; and, the accepted rule today is that in appropriate cases in the interests of justice, a court may make its decision prospective.' (Emphasis and footnote in original omitted; our emphasis added.) *Ostwald v. State*, Wyo., 538 P.2d 1298, 1303 (1975).

"Where an overruling decision announces a change in the common law, some guidelines are set forth in *Chevron Oil Company v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), for whether its operation should be retrospective or prospective only:

" 'In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see e.g., *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, supra, 392 U.S. [481], at 496, 88 S.Ct. [2224], at 2233, [20 L.Ed.2d 1231 (1968) ], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e.g., *Allen v. State Board of Elections, supra*, 393 U.S. [544], at 572, 89 S.Ct. [817], at 835, [22 L.Ed.2d 1 (1969) ]. Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra*, 381 U.S. [618], at 629, 85 S.Ct. [1731], at 1738, [14 L.Ed.2d 601 (1965) ]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." ' *Id.*, 92 S.Ct. at 355.

"This court has on several occasions considered whether a change in law should operate retrospectively or prospectively. *In Nehring v. Russell*, Wyo., 582 P.2d 67, 80 (1978), we stated that

" '* * * the determination is ours to make, [and] we conclude that in consideration of all the factors and any prior reliances involved, our holding should be applied prospectively only, i.e., to this action and all causes of action accruing after 30 days following the date of this decision.' " (Emphasis in original.)

In this state, the impact rule was the common law applicable to incidents similar to that in this case at the time of such incident. Section 8–1–101, W.S.1977 (August 1978 Replacement), provides:

"The common law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, are the rule of decision in this state when not inconsistent with the laws thereof, and are considered as of full force until repealed by legislative authority."

We have often applied the common law, e.g., *Goldsmith v. Cheney*, Wyo., 468 P.2d 813 (1970); *McKinney v. McKinney*, 59 Wyo. 204, 135 P.2d 940 (1943); *State v. Foster*, 5 Wyo. 199, 38 P. 926 (1895). We have recognized that the common law is not exactly as it was in 1607, but it encompasses changes by judicial decisions since that time, including English decisions and other common-law decisions in United States courts. *Snell v. Ruppert*, Wyo., 541 P.2d 1042 (1975); *Krug v. Reissig*, Wyo., 488 P.2d 150, 52 A.L.R.3d 748 (1971); *Naab v. Smith*, 55 Wyo. 181, 97 P.2d 677 (1940). As said in *Choman v. Epperley*, Wyo., 592 P.2d 714, 716 (1979):

"The adoption of common law by Wyoming was not an adoption of a set code of law. * * * Nor was the adoption one of static and nonchanging law. * * *"

And as said in *Johnston v. Laird*, 48 Wyo. 532, 538, 52 P.2d 1219 (1935):

"* * * [W]e must decide this case in accordance with the decisions subsequent to the time of James I, in so far as not inconsistent with the laws of this state, and the decisions which must govern us, to the extent mentioned, are not only the English decisions * * *, but other decisions as well, comparatively recent though they may be * * *."

In *Victorian Railways Commissioners v. Coultas*, 13 A.C. 222, 226 (1888), the judicial committee of the Privy Council refused damages to the plaintiff caused by the defendant's negligence in absence of proof of actual impact. The judgment, speaking through Sir Richard Couch, noted that precedent had not been previously established in a similar action. In the same year, recovery was denied for physical injuries due to fright in *Lehmon v. Brooklyn City R. Co.*, N.Y., 47 Hun 355 at 356 (1888), Justice Dykman also noting that there was no principle or authority "found or referred to for such action." Thus was started the impact rule.

The impact rule has been changed in many respects by this Court and most courts since 1888. But it is necessary to distinguish the situations in which it has been changed and which have no pertinency to this case. We are not here concerned with tort injuries caused by other than negligence. False imprisonment, trespass, intentional acts, worker's compensation acts, et cetera are subject to different standards and results. Nor are we concerned with mental injuries which result in physical damage. The situation wherein the plaintiff is the direct victim [1] of the defendant's negligence must be distinguished from cases, such as this, in which the plain-

tiff is a bystander or is one even further removed from being a direct victim of the defendant's negligence. Requirements for liability for injuries resulting from one of these circumstances are not necessarily appropriate in gauging liability in the others. This is a bystander case, and, as noted in the majority opinion, it is the first case in this state for consideration of a change from the common-law impact rule in such cases. The impact rule was generally considered to be the common-law rule. See McCormick on Damages § 89 (1935); Prosser, Law of Torts, §§ 12, 53 and 54 (1971); 38 Am.Jur.2d, Fright, Shock, and Mental Disturbance §§ 1, 3 and 36 (1968).

The trial court's ruling was proper under the law at the time of the ruling and at the time of the incident. We should not overrule it retroactively. I would affirm the trial court on this basis.

## PROSPECTIVE APPLICATION

Medical science has advanced a great deal since the adoption of the impact rule. Diagnostic techniques, research tools, and educational advancement are of sufficient magnitude as compared with those of 1888 to allow, *under certain circumstances,* the proof of mental injury and its causal connection with an incident occasioned by the defendant's negligence, and to *reduce, not eliminate,* the probability of specious or fraudulent claims. Accordingly, I believe it is necessary to carefully designate the circumstances under which an action will lie prospectively.

The majority opinion has attempted to do this. Noting that this is a bystander case and that said herein concerns only such cases, my disagreement with prospective application of the majority opinion, as stated supra, is with its extension of those allowed to recover beyond spouses, parents, and children of the person seriously injured or killed and with its extension of allowing such recovery by them if they

---

1. Cases involving a "direct victim" are those in which the damages result from the plaintiff's fear for his or her own safety as a result of the defendant's actions directed against the plain-

tiff; e.g., handling of dead bodies, negligence of common carriers, or in telecommunications, et cetera.

come upon the scene of the incident *after* its occurrence and before there is a material change in the condition and location of the victim.

With reference to the necessary relationship between the primary victim and the bystander, I agree that the policy set by the legislature in the wrongful death act is a proper place to draw the line. I do not agree that the interpretation of the wrongful death act phrase, "every person for whose benefit such action is brought," by the Court in *Wetering v. Eisele*, Wyo., 682 P.2d 1055, 1060 (1984), was proper. In fact, the interpretation in that case was that such phrase included persons identified in the statute providing for intestate distribution—persons in addition to those defined in the majority opinion and who could be far more removed in relationship than parents, children, spouses, and siblings. Technically, it would include the paper boy.

I believe the proper interpretation of the phrase was that made in *Jordan v. Delta Drilling Company*, Wyo., 541 P.2d 39, 78 A.L.R.3d 1215 (1975), and *Saffels v. Bennett*, supra—i.e., parents, spouses, and children. My dissent in *Wetering v. Eisele*, joined by Justice Brown, reflected the common sense difficulty with the problem in that relationship does not *always* indicate the extent of the loss. A very close friend, perhaps working and living with the deceased for several years, may be closer to the deceased than a brother who has not seen the deceased or kept in touch with him for many years. Nevertheless, the practical necessity of drawing the line at a reasonable place dictates that it be done on the legislatively declared policy as interpreted by the Court in Saffels v. Bennett and Jordan v. Delta Drilling Company. If a case similar to this one occurred prospectively, the mother, brother, and sister would qualify as plaintiffs from the relationship standpoint under the majority opinion and under my analysis—although the result would be reached in a different fashion in each instance.

With reference of a plaintiff's proximity to the incident as a qualification of a proper party plaintiff, I would not allow a proper plaintiff status unless the party were at the location of the incident at the time it occurred. Again, it is a question as to where the line should be drawn. A death can occur on a highway, several days before it is discovered. And, if it is the sight of the injuries which causes the damage, such can occur upon viewing the victim hours later in the morgue or hospital. In other words, I would extend the position of the Restatement, Second, Torts only slightly. Section 436A thereof provides:

"Negligence Resulting in Emotional Disturbance Alone

"If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."

Restatement, Second, Torts § 436 reflects the existence of liability if the negligent conduct subjects the plaintiff to fright or emotional disturbance, *which in turn causes bodily harm*, and subsection (3) thereof applies the rule *when the bodily harm* results from "shock or fright at harm or peril to a member of his immediate family occurring in his presence."

Restatement, Second, Torts § 46 concerns recovery for severe emotional distress occasioned by "extreme and outrageous conduct intentionally or recklessly" causing severe emotional distress.

The circumstances of this case do not fall within that set forth in Restatement, Second, Torts § 436 or § 46, but the provisions thereof reflect a reasoning which I can carry to the circumstances of this case and thus go further than that provided in § 436A and allow recovery as set forth supra—i.e., if a case similar to this occurs prospectively, only Johnny's brother would be a proper plaintiff.

## CONSORTIUM

Since the mother would not be a proper plaintiff, not having been at the scene when the incident occurred, her husband, Johnny's stepfather, could not recover for loss of consortium.

Additionally, since loss of consortium has been held to be a form of mental injury, *Scott v. St. Louis-San Francisco Railway Company,* 39 Tenn.App. 534, 286 S.W.2d 347 (1954), Johnny's stepfather should not be a proper plaintiff even under the criteria of the majority opinion. He was not at the scene at the time of the incident and did not arrive before there was a material change in it, and he was not Johnny's father.

## INSURANCE

The majority opinion refers to the effect of insurance upon the issue. I believe courts should determine cases on the merits without any consideration of insurance one way or the other. The decisions should be founded on the relative rights of the parties without any knowledge or consideration on our part of their insured status.

I would reverse.